NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11627

COMMONWEALTH  vs.  ALEX SCESNY.


Worcester.      March 6, 2015. - July 14, 2015.

Present: Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide. Rape. Evidence, Expert opinion, Photograph, Relevancy and materiality, Identification, Third-party culprit. Witness, Expert. Constitutional Law, Confrontation of witnesses. Practice, Criminal, Capital case, Confrontation of witnesses, Argument by prosecutor, Instructions to jury.



Indictments found and returned in the Superior Court Department on September 12, 2008.

The cases were tried before Richard T. Tucker, J.


Kenneth I. Seiger for the defendant.
Ellyn H. Lazar-Moore, Assistant District Attorney, for the Commonwealth.


BOTSFORD, J.  In October of 1996 passersby discovered the body of a woman, Theresa Stone (victim), by the side of a road in Fitchburg.  Sixteen years later, in March of 2012, a Worcester County jury convicted the defendant, Alex Scesny, of

murder in the first degree and aggravated rape in connection with her death.[1]  Before us is the defendant's appeal from these convictions.  The defendant argues that (1) the evidence was insufficient to support the convictions; (2) the trial judge erred in admitting opinion testimony of a criminalist employed by the Commonwealth because the witness was not qualified to render the opinion stated; (3) the admission of an autopsy report prepared by a medical examiner who did not testify at trial, and of testimony of a substitute medical examiner, violated the defendant's constitutional right to confront witnesses; (4) it also was error to admit a witness's testimony, based on her examination of a photograph that itself should not have been admitted, that she recognized the defendant as one who had patronized a bar in which the victim was seen on the night of her death; (5) the prosecutor's closing argument was improper, impinging on the defendant's fundamental right to present a defense; and (6) the judge erred in declining to instruct the jury in accordance with the defendant's proposed instruction on third-party culprit evidence.  We conclude that the evidence was insufficient to convict the defendant of aggravated rape, and reverse his conviction of this crime.  We

---

[1] The jury found the defendant guilty of murder in the first degree under all three theories:  deliberate premeditation, extreme atrocity or cruelty, and felony-murder.

affirm the defendant's conviction of murder in the first degree.[2]

Background. 1. Facts. The defendant challenges the sufficiency of the evidence, and therefore we summarize the facts the jury could have found in the light most favorable to the Commonwealth. Commonwealth v. Earle, 458 Mass. 341, 342 (2010). We reserve certain facts for later discussion in connection with other issues raised.

On October 23, 1996, the victim and her daughter, Nashea Falcon,[3] spent the day running errands together and returned in the afternoon to the apartment where they were living in Fitchburg. At approximately 7 P.M. that evening, the victim left the apartment to buy some groceries for dinner. Shortly thereafter, she visited the Brau-Hoff, a bar on Main Street in Fitchburg. She arrived alone, stayed for about an hour or more, and talked to the bartender, Jessie Spencer. The victim left the bar alone and subsequently returned to the apartment with groceries. She told Nashea that she had received a ride home

---

[2] The reversal of the defendant's conviction of aggravated rape means the jury's determination that the defendant was guilty of felony-murder in the first degree cannot stand. Because the jury also found the defendant guilty under the other two theories of murder, however, and because we discern no error affecting those findings, the defendant's conviction of first degree murder is affirmed.

[3] Nashea Falcon was formerly known as Nashea Stone. By the time of the trial in 2012, she had married Efrain Falcon, her boy friend at the time of the victim's death in 1996. We refer to her by her first name, Nashea, to avoid any confusion.

from a man in a black truck who was waiting for her outside, but that she did not want to go with him.  Sometime between 9:30 and 10:30 P.M., the victim left the apartment again and told Nashea she was going to "Work-a-Day," a temporary employment agency.[4] That was the last time Nashea saw the victim alive.

On October 25, 1996, responding to a telephone call regarding a body by the side of a road in Fitchburg, the police observed a white female lying on her left side with her face down on the ground, her pants and underwear pulled down to her knees, and her knees, thighs, buttocks, and lower abdominal area exposed.  There was a light coating of leaves over the body, and its lividity appeared consistent with the position in which it was found.  Police discovered what appeared to be a condom wrapper underneath or in the vicinity of the body.  The body was identified as the victim's through fingerprint analysis.  The cause of death was strangulation by ligature.  The autopsy revealed that two of the victim's teeth had been broken off, that she had blood in her mouth, and that there were injuries to her eyelids, nose, neck, left shoulder, right clavicular region, right arm, right metacarpal, and right thigh.

During trial, the Commonwealth and the defendant stipulated

---

[4] According to Nashea, the victim had worked as a prostitute in the past, and when the victim left the apartment at approximately 9:30 P.M. on October 23, 1996, it would not have surprised her (Nashea) if the victim was "going to make some money that night."

to the following:

> "After [the victim's] body was discovered on Kinsman Road on October 25, 1996, blood samples and vaginal and anal swabs were taken as evidence. This material was sent to the Mass[achusetts] State Police crime [laboratory] for [deoxyribonucleic acid (DNA)] testing. These tests generated DNA profiles, which were made part of a DNA database. In 2008, for reasons completely unrelated to the investigation of [the victim's] death, [the defendant's] DNA profile was entered into that system. Sometime after that, a link was believed to be established between [the defendant's] DNA profile and biological evidence taken from [the victim]. At a later date, [the defendant] provided another DNA sample for further comparison purposes."[5]

The rectal swab taken from the victim contained sperm cells, and the DNA profile generated from the sperm matched the DNA profile for the defendant.[6] The probability of a randomly selected, unrelated individual having a DNA profile matching the major profile obtained from the rectal swab was one in 13.2 quadrillion of the Caucasian population.[7]

Upon examination of the victim's body, a number of small, red-brown stains were noted on the victim's exposed skin and

---

[5] The trial judge read this stipulation to the jury during the trial.

[6] The rectal swab generated two deoxyribonucleic acid (DNA) profiles, a sperm fraction and a nonsperm fraction. The profile generated for the sperm fraction was a mixture of DNA, meaning that more than one person contributed DNA to that fraction. The major profile for that fraction matched the DNA profile for the defendant. The minor profile for the sperm fraction contained some cellular material "carr[ied] over" from the nonsperm fraction, and it was consistent with the victim's DNA.

[7] The defendant is Caucasian.

clothing. A screening test for the presence of blood was performed on stains from the victim's lower pant leg and sneaker, as well as her right hip and right thigh-left knee area. The stains tested positive indicating that blood may be present. The stain on the thigh-knee area was submitted for further testing and a confirmatory test for human blood was also positive.[8]

DNA profiles generated from the stains on the sneaker, hip, and thigh-knee area indicated a mixture of DNA from more than one source. The defendant matched the major profile in the DNA mixture on the hip. The probability of a randomly selected unrelated individual having a DNA profile matching this stain was approximately one in 1.366 billion of the Caucasian population. The defendant also was included as a potential contributor to the DNA mixtures on the sneaker and thigh-knee area. The probability of a randomly selected unrelated individual having contributed DNA to the mixture was approximately one in sixty-one of the Caucasian population for each of these two stains.

Male-specific DNA testing also was performed on three areas of the victim's underwear. In the first area, a partial male DNA profile was generated that matched the defendant's; the

---

[8] The other stains were too small for confirmatory testing.

probability that a randomly selected individual would match the profile was one in two of the male population. In the second area tested, a partial male DNA profile was generated that did not match the defendant's profile. In the third area tested, no male DNA was found. A screening test for the presence of blood on three red-brown stains found on the underwear was positive.[9] No seminal fluid was found to be present on the victim's underwear, which suggested that the victim had not pulled up her underwear and pants after the semen in her rectum had been deposited.[10]

Some of the red-brown bloodstains[11] on the victim's body and

---

[9] A screening test for blood on a fourth red-brown stain on the underwear was negative.

[10] Debra McKillop, a criminalist who had been employed by the Commonwealth at the time of the victim's death, testified that if a liquid such as seminal fluid is deposited in an orifice, such as the vaginal, anal, or other cavity, it is a common occurrence, when cloth or other material is placed over the orifice, that liquid will be absorbed into the material; and that if the victim had pulled up her underwear and pants following deposit of semen or sperm in her rectum, some drainage or transference onto her underwear could be expected. Doctor Henry Nields, a physician and the substitute medical examiner, however, testified that drainage of seminal fluid from the anal opening onto underwear after anal sex may or may not be present. The defendant challenges the admission of McKillop's opinion testimony on the ground that she was not professionally qualified to give it. The defendant's argument is discussed infra.

[11] As suggested in the text, the evidence concerning the red-brown stains would permit the jury to find that they were bloodstains and, in particular, the defendant's bloodstains.

clothing appeared to have been deposited at an angle, suggesting that the blood causing the stains had hit the victim's body at an angle and that some type of action or force had been involved. The stains on the victim's skin did not appear to be disturbed, meaning they had been deposited on the body and had dried in the condition in which the investigating police and criminalists found them. The stains' appearance again suggested that the victim had not pulled up her pants after the stains were deposited.[12]

Jessie Spencer worked as a bartender at the Brau-Hoff bar in Fitchburg on the night of October 23, 1996, the night of the victim's disappearance. In 2008, police showed Spencer several photographs and asked her whether she recognized any of the persons depicted in them as customers of the bar. She was shown a photograph of the defendant and was "pretty certain" she recognized him. Over-all, four of the six photographs she was shown were of men she recognized from the bar.

The defense conceded at trial that the defendant had had sexual intercourse with the victim, but argued that the

---

[12] Testimony was presented indicating that if the stains had been wet when deposited on the victim, and the victim subsequently had pulled up her pants, some sort of interruption or disturbance of the stain would be expected. If the stains on the victim's body had been dry and the victim then pulled up her pants, any friction or contact with the clothing could have dislodged the stain causing it to fall free from the skin.

intercourse was consensual.  He stressed that the stains on the victim's hip, knee, and sneaker contained a mixture of DNA from more than one person,[13] and argued that any potential contribution by him to the DNA in the stains was not necessarily blood, but could have been some other bodily substance transferred onto the victim's body during their sexual encounter.

The defendant also presented evidence at trial suggesting that two other men may have been responsible for the victim's death:  Everett Carlson and James Webber, who was the victim's former husband and father of Nashea.  Both men were excluded as sources of the sperm on the rectal swab taken from the victim, as well as the DNA mixture in the stains on the victim's sneaker and right thigh-left knee; the major male DNA profile in the stain on the victim's right hip also did not match either man.[14] Webber was excluded as a source of the partial male DNA profile generated from the stains on the first area tested from the victim's underwear, but Carlson was included, meaning his DNA profile matched the partial male DNA profile identified in that

---

[13] The victim was included as a potential contributor to the DNA mixture on the sneaker; the DNA mixtures from the hip and knee yielded inconclusive results with respect to the victim.

[14] The minor profile yielded inconclusive or insufficient results for comparison.

area of the underwear.[15]  Both Webber and Carlson were excluded
as sources of the male DNA detected in the second area tested
from the victim's underwear.[16]

   2.  Procedural history.  In 2008, the defendant was
indicted for the murder and aggravated rape of the victim.  As
indicated, in March of 2012 a jury convicted the defendant of
murder in the first degree on the theories of deliberate
premeditation, extreme atrocity or cruelty, and felony-murder;
he also was convicted of aggravated rape.  The defendant filed a
timely appeal of his convictions, which we consider here.

   Discussion.  1.  Sufficiency of the evidence.  The
defendant claims there was insufficient evidence to prove that
he was the perpetrator of the victim's murder and that he
committed aggravated rape.  He does not dispute that the DNA
from the rectal swab taken from the victim established that he
had intercourse with her, but asserts there was no evidence to
prove that the sexual interaction was not consensual.  He also
contends that the additional forensic evidence was ambiguous,

---

[15] The probability that a randomly selected individual would
match the partial male profile identified was one in two of the
male population; as previously indicated, the defendant's DNA
was also included as a possible source.

[16] The defendant was excluded as a possible source of the
male DNA detected in this area as well, indicating that a male
other than the defendant, Carlson, or Webber contributed this
stain.

inconclusive, speculative, and ultimately insufficient to prove that he murdered the victim;[17] and that apart from this forensic evidence, the Commonwealth provided no evidence connecting him to the scene or to the murder. To support this argument, he notes the evidence that the victim was a prostitute and therefore had consensual sex with men, and further that the autopsy report revealed the victim's external genitalia and anus were normal -- that is, without any sign of injury or trauma.

With respect to the charge of murder, the defendant's claim fails. The trial evidence considered in the light most favorable to the Commonwealth would allow the jury reasonably to find that the defendant had sex with the victim (as he conceded), at or near the time of her death; the red-brown stains on the victim's body and clothes were or certainly included the defendant's blood; the victim had not pulled up her underwear and pants after having anal intercourse with the defendant or after the defendant's blood was deposited on her

---

[17] In particular, the defendant argues that DNA testing done on the stains from the victim's body and clothing did not identify the bodily source of the substance creating the stains, and thus his potential contribution to the DNA mixtures was not necessarily blood but could have been some other biological fluid -- e.g., saliva or semen -- transferred to the victim during intercourse. He also points to the fact that the DNA found on the victim's underwear could have matched half of the male population, and that the DNA testing performed actually established that a fourth, unidentified man contributed sperm DNA to these underwear stains.

body; the victim died from strangulation by ligature; she also suffered significant injuries to her face as well as to her arm and thigh; and she could have encountered the defendant at the Brau-Hoff bar on the evening or night of October 23, 1996.

Based on this evidence, the jury reasonably could infer that the defendant had sex with the victim and then strangled her. See Commonwealth v. Perkins, 450 Mass. 834, 837-838 (2008) ("Because death had occurred while [the victim] was lying on her back, and because no sperm cells were found on the crotch area of her panties, death probably occurred after intercourse and before [the victim] could pull up her clothes such that her panties would collect sperm cells draining from her body"). This is a sequence of events that supports a determination that the defendant acted with deliberate premeditation. See Commonwealth v. Bregoli, 431 Mass. 265, 269-270 (2000) ("evidence of death by strangulation supported an inference that the victim's death was not instantaneous, but the result of pressure applied to her neck until she lost consciousness," which warranted finding that defendant "acted with malice and deliberate premeditation"). Moreover, the extent and severity of the victim's injuries permitted a finding of extreme atrocity or cruelty. See Commonwealth v. Scott, 470 Mass. 320, 321, 324-325 (2014) (evidence that victim was raped and strangled, with significant injuries to head, skull, and face, supported jury's

guilty verdict of murder in first degree under theory of extreme atrocity or cruelty [as well as other two theories of murder]). With respect to the murder charge, therefore, the Latimore test was met. See Commonwealth v. Latimore, 378 Mass. 671, 677 (1979) (considering evidence in light most favorable to Commonwealth, we ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

We agree with the defendant, however, that the evidence presented was not sufficient to support his conviction of aggravated rape. This court has established that "[t]he essence of the crime of rape, whether aggravated or unaggravated, is sexual intercourse with another compelled by force and against the victim's will or compelled by threat of bodily injury." Commonwealth v. McCourt, 438 Mass. 486, 494-495 (2003). "Absence of consent is an essential element of the crime of rape, whether aggravated or unaggravated." Commonwealth v. Cheremond, 461 Mass. 397, 408 (2012). Here, the evidence from which the jury could reasonably infer lack of consent was itself lacking. Although the victim was found with her pants and underwear pulled down to her knees, the clothing was intact with no evidence of rips or tears. Contrast, e.g., Commonwealth v. Tavares, 27 Mass. App. Ct. 637, 642 (1989), S.C., 57 Mass. App. Ct. 1111 (2003) (evidence was sufficient to support conviction

of aggravated rape where, inter alia, victim "woke up without her pants and her blouse and bra were torn"). In addition, the autopsy report established that the victim's external genitalia and anus were normal, and no injuries were noted in these areas. Contrast, e.g., Commonwealth v. Miller, 435 Mass. 274, 278 (2001) (evidence that victim's thighs were bruised and her vaginal opening had been injured, together with other evidence, was sufficient to prove beyond reasonable doubt that defendant had raped victim). There also was evidence that the victim had worked as a prostitute in the past; further, the victim's daughter indicated that she would not be surprised if the victim was "going to make some money" the night she was murdered, and the victim's body was found about one-half mile to one mile from an area known to be a place that prostitutes frequented with their customers.

The Commonwealth's case against the defendant was entirely circumstantial. Although the victim ultimately suffered severe injuries that, the jury could infer, were inflicted in connection with her murder, there was no evidence favoring the inference that the defendant raped the victim before killing her over the inference that he had consensual sex with the victim and then killed her. "When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof."

Commonwealth v. Cannon, 449 Mass. 462, 467 (2007), quoting
Commonwealth v. Fancy, 349 Mass. 196, 200 (1965).  Accordingly,
because the evidence was insufficient to permit a finding of
lack of consent beyond a reasonable doubt, the defendant's
conviction of aggravated rape must be reversed, and the jury's
finding that the defendant was guilty of murder in the first
degree on a theory of felony-murder must be set aside.[18]

2.  Expert testimony.  The defendant argues that the trial
judge abused his discretion in admitting the opinion testimony
of Debra McKillop, a criminalist with the State police crime
laboratory (crime lab) at the time the victim's killing was
initially investigated in 1996.  At trial, the defendant
objected to two portions of McKillop's testimony:  (1) that,
based on her experience, she would have expected there to be
some drainage located on the victim's underwear if the victim
had pulled up her underwear following the deposit of semen in
her rectum; and (2) that she would expect to see some

---

[18] This conclusion follows from the fact that aggravated
rape was the sole felony put before the jury as a possible
predicate felony for felony-murder in the first degree.  The
conclusion, however, does not affect the defendant's murder
conviction because the jury also convicted the defendant on
theories of deliberate premeditation and extreme atrocity or
cruelty, and the evidence was sufficient to support a conviction
on these theories.  See Commonwealth v. Evans, 469 Mass. 834,
842-843 (2014), and cases cited (where jury convicts defendant
of murder in first degree under more than one theory, "evidence
supporting either theory would suffice to affirm the verdict").

interruption or disturbance of the stains on the victim's body, if the victim had pulled up her pants after the stains had been deposited.[19] The defendant argues that McKillop's opinion testimony in these areas exceeded the scope of her qualifications and failed to meet the foundational requirements for expert testimony. He further claims that because this testimony was a pivotal piece of the Commonwealth's case, its admission was highly prejudicial.[20]

"A trial judge has wide discretion to qualify an expert witness and to decide whether the witness's testimony should be admitted." Commonwealth v. Frangipane, 433 Mass. 527, 533 (2001). "The admission of expert testimony will be reversed only where it constitutes an abuse of discretion or other error of law." Id. See Commonwealth v. Avila, 454 Mass. 744, 764 (2009) (judge's decision to admit testimony "will not be upset on appeal if any reasonable basis appears for it" [citation

---

[19] The defendant's trial counsel did not state the specific ground for his objections, but the defendant argues here that it was apparent from the context that the objection was to the lack of adequate foundation for McKillop's opinion testimony. Nothing in our resolution of this issue turns on the point, and we assume for argument that the defendant is correct.

[20] The Commonwealth argues that defense counsel raised only general objections to this testimony at trial and thus did not preserve the claim, so that the correct standard of review is whether the error, if any, created a substantial likelihood of a miscarriage of justice. Because we determine there was no error in admitting the contested testimony, we need not resolve the standard of review issue.

omitted]).  "In qualifying an expert witness, the question for judicial decision is whether the witness has sufficient skill, knowledge, and experience in the area of his training to aid a jury."  Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990).

McKillop testified at trial that she was employed at the crime lab from 1986 until her retirement in 2007.  After one year working as a criminalist in the toxicology unit, she transferred to the criminalistics section where her experience entailed going to crime scenes to collect evidence as well as working on evidence submitted to the crime lab.  The cases she worked on included fatal or nonfatal shootings, beatings, stabbings, and sexual assaults, and involved a variety of evidence including identification of body fluids, including blood, saliva, and semen, as well as collection of trace evidence, such as hair, fibers, paint, glass, and gunshot residue.  Later in her career McKillop was a supervisor in the criminalistics unit for approximately nine years, and supervised both the criminalistics and DNA units of the crime lab in the two years before she retired.  At the time she testified at trial in 2012, McKillop was the forensic manager of the crime laboratory of a county sheriff's office in California, where she was responsible for overseeing the crime scene response unit, the biology or DNA unit, the firearms unit, and the latent print unit.  She also has bachelor's degrees in chemistry and

environmental studies from the University of California in Santa Barbara.

McKillop's challenged opinion testimony concerning what she would expect to see if the victim had pulled up her underwear and pants following intercourse and following the deposit of the red-brown stains on her body clearly was based on this extensive experience.[21] The judge did not abuse his discretion in admitting this testimony. See Commonwealth v. Rice, 441 Mass. 291, 297-299 (2004) (no abuse of discretion in permitting State police chemist employed at crime lab to testify to opinion concerning how long sperm may be found following ejaculation, based on training and experience); Frangipane, 433 Mass. at 533-535 (where social worker witness had extensive training, education, and experience interviewing and treating sexually abused children, judge had discretion to allow witness to opine concerning dissociation and recovered memory and fact that

---

[21] McKillop was asked explicitly whether, "in [her] experience," she would expect to see some sort of drainage or transference of seminal fluid to the victim's underwear. McKillop responded that drainage is "a common occurrence" and stated, "in my experience, when examining cases in the laboratory, we will see a consistency of having a stain on the garment." Similarly, McKillop was asked, "based on that same training and experience," whether the stains on the victim's body appeared to be disturbed, and it was evident from the context that McKillop's testimony on this topic was based on her prior work as a criminalist; the defendant is not correct that McKillop did, or was required to, base her opinions on an expert level of knowledge of anatomy or physiology.

victims of trauma may experience them; witness was not required to be medical doctor). Compare id. at 535-536 (error to permit social worker witness to testify about how trauma victim stores, retrieves, or dissociates traumatic memory because opinions concerned physical functioning of brain; subject matter area was proper for medical doctor, not social worker).[22]

There was no abuse of discretion or other error in the trial judge's decision to admit McKillop's testimony.[23]

3. Substitute medical examiner. The medical examiner who performed the autopsy on the victim retired approximately twelve

_____

[22] In contrast to the substitute medical examiner who testified in this case regarding the anatomy of the rectum and the sphincter muscle, McKillop did not testify to the physical functioning of the body; her testimony was limited to opinions based on her prior observations and experience as a criminalist. To the extent that, as the defendant claims, the opinions of the substitute medical examiner and McKillop contradicted each other, such contradiction goes to the weight of the testimony, not its admissibility. See Commonwealth v. Rice, 441 Mass. 291, 299 (2004).

[23] It bears noting that in addition to McKillop, Beth Saucier Goodspeed, a chemist employed at the State police crime laboratory, testified at trial that if the victim had pulled up her pants following the deposit of semen or sperm in her, Goodspeed would have expected some drainage onto the victim's underwear. It is also the case that the topic of semen draining out onto underwear has been addressed by State police criminalists in other cases. See, e.g., Commonwealth v. Scott, 470 Mass. 320, 323 (2014) (State police criminologist testified "if somebody is up walking around, . . . semen would be draining out of her and would be on the underwear if she were wearing it," and pattern of stains found on victim's skirt was "consistent with drainage if a person were laying [sic] horizontal[ly]").

years before the defendant's trial took place.  A substitute medical examiner, Dr. Henry Nields, testified at trial regarding certain findings in the autopsy report:  that the victim's teeth were broken off; that there was blood in the victim's mouth; and that there were injuries to the victim's eyelids, nose, neck, shoulder, clavicular region, arm, and thigh.  He also testified to his opinion as to the cause of the victim's death.  The defendant did not object to any of Nields's testimony.  In addition, the autopsy report and photographs from the autopsy were introduced in evidence without objection.  The defendant now argues that admission of the autopsy report and the substitute medical examiner's testimony about the underlying findings in the report violated the defendant's constitutional right to confrontation.[24]  Because there was no objection to admission of the report or testimony at trial, we review for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Emeny, 463 Mass. 138, 145 (2012).

An autopsy report prepared by a medical examiner who is unable to testify constitutes "inadmissible hearsay whose admission violate[s] the defendant's right of confrontation under the Sixth Amendment to the United States Constitution";

---

[24] The defendant correctly does not challenge the substitute medical examiner's opinion testimony as to the cause of the victim's death.  See Commonwealth v. Emeny, 463 Mass. 138, 145 (2012).

and a substitute medical examiner is not permitted to testify about the underlying facts and findings of the report on direct examination.  Id. at 145, quoting Commonwealth v. Walker, 460 Mass. 590, 594 n.6 (2011).  See Commonwealth v. Phim, 462 Mass. 470, 479 (2012).  Thus, neither the report nor Nields's testimony about the findings in the report should have been admitted.

The defendant argues that the admission of this evidence created a substantial likelihood of miscarriage of justice because the Commonwealth relied on the evidence about the victim's injuries to prove that the defendant inflicted them and then bled on the victim.  The defendant claims this was critical evidence because there was no other evidence connecting the defendant to the injuries, and the over-all evidence of guilt was not so overwhelming as to nullify its effect.  We disagree for three reasons.

First, the defendant used the evidence relating to the autopsy findings and Nields's testimony in particular to help build his defense.  Specifically, on cross-examination, the defendant elicited testimony from Nields about his observations that there were no visible injuries to the victim's genitals or anus.  The defendant then used this testimony to support his claim that the evidence was insufficient to prove the intercourse between the victim and defendant was consensual, and

defense counsel reiterated the point in his closing argument. See Commonwealth v. McCowen, 458 Mass. 461, 482 (2010) ("There can be no substantial likelihood of a miscarriage of justice where the defendant fails to object to the admission of testimonial hearsay and then relies on that erroneously admitted hearsay to challenge the prosecution's theory of the case"). See also Commonwealth v. Nardi, 452 Mass. 379, 395-396 (2008) (no substantial likelihood of miscarriage of justice where autopsy findings were admitted without objection and defense expert "made use of and referenced those findings in his testimony").

Second, Nields's testimony about the findings in the autopsy report is cumulative of the injuries depicted in the properly admitted autopsy photographs,[25] and of Nields's testimony regarding his review of these photographs. See Commonwealth v. Rogers, 459 Mass. 249, 265-266, cert. denied, 132 S. Ct. 813 (2011) (no error in admission of testimony based on autopsy photographs that constituted independently admissible evidence); McCowen, 458 Mass. at 481 n.17 ("Dr. Nields, using the photographs admitted in evidence, properly testified to the location and nature of the victim's injuries").

Third, the autopsy report and Nields's testimony about the

_____

[25] The photographs were admitted through a State police trooper who attended the autopsy.

victim's injuries did not relate to an issue contested at trial. The defendant challenged his identification as the perpetrator of the injuries, but did not dispute the nature of the injuries the victim suffered. Rogers, supra at 266 (testimony by substitute medical examiner about length and depth of stab wound was not relevant to any contested issue when defense was lack of identification of defendant as stabber).[26]

In sum, no substantial likelihood of a miscarriage of justice arose from the erroneous admission of the autopsy report and Nields's autopsy-related testimony. The defendant's argument fails.

4. Evidence that the defendant patronized the Brau-Hoff bar. Jessie Spencer testified at trial that she was "pretty certain" the defendant at some (undefined) point had been a patron of the bar, based on her examination of a photograph of the defendant the police had shown her in 2008. The defendant argues that the testimony was irrelevant because Spencer was only "pretty certain" the defendant had been a customer at the bar, and there was no testimony about when. The defendant

---

[26] Contrary to the defendant's suggestion, the fact that the victim suffered certain injuries did not indicate that the defendant had inflicted them. In terms of identifying the defendant as the person who caused the victim's injuries, the DNA evidence was the relevant evidence. The autopsy report and Nields's testimony about the autopsy findings did not relate to DNA evidence.

alleges that the erroneous admission of this evidence resulted in the unwarranted inference by the jury that both the victim and defendant were present at the bar on the night of the homicide. There was no error.

"Evidence is relevant if it has a rational tendency to prove a material issue." Commonwealth v. Bresilla, 470 Mass. 422, 436 (2015), quoting Commonwealth v. Dunn, 407 Mass. 798, 807 (1990). To be relevant, "[e]vidence need not establish directly the proposition sought; it must only provide a link in the chain of proof." Commonwealth v. Gordon, 407 Mass. 340, 351 (1990), quoting Commonwealth v. Tobin, 392 Mass. 604, 613 (1984). The trial judge has "substantial discretion in deciding whether evidence is relevant, and whether the prejudicial implications of such evidence outweigh its probative value." Commonwealth v. Pina, 430 Mass. 66, 78 (1999), quoting Tobin, supra. A judge's determination will not be overturned unless palpable error is found. Bresilla, supra.

The testimony by Spencer that she was "pretty certain" the defendant had been a patron at the bar was relevant and properly admitted. Although the information does not establish that the defendant was at the bar on the night the victim was murdered, it has a rational tendency to prove a link, however slight, between the defendant and victim, and makes the fact that the defendant encountered the victim on the night of her murder more

probable than it would be without the evidence. See Mass. G. Evid. § 401 (2014). The absence of any time frame for when the defendant was a patron of the bar certainly decreases the probative value of the testimony, but the defendant has failed to show that the evidence was "unduly" prejudicial, or more prejudicial than probative. See Commonwealth v. Arroyo, 442 Mass. 135, 144 (2004).[27]

5. Prosecutor's closing argument. The defendant contends that the prosecutor's closing argument was improper in a number of respects: the prosecutor unfairly disparaged the defendant's constitutional right to present a third-party culprit defense, misstated the law, engaged in improper vouching of evidence, and misstated the evidence. The combined effect of the improprieties, he argues, requires reversal and a new trial.

There is no question that the prosecutor's argument was flawed. Before reaching the principal focus of his attack, the defendant's third-party culprit theory, the prosecutor told the jury:

---

[27] The defendant also argues that introduction of his photograph in evidence following Jessie Spencer's testimony about it was prejudicial; he claims the photograph was similar to a mugshot, and conveyed to the jury that the defendant had a criminal history. The defendant's trial counsel specifically disagreed with this assessment in declining the judge's offer to provide a limiting instruction. An examination of the photograph, which is in the record, persuades us that the defendant's argument on this point is without merit. See Commonwealth v. Cruz, 445 Mass. 589, 594 (2005).

"I'm privileged, and moreover proud to represent the citizens of the Commonwealth -- that's who I represent. This is not a case about the prosecutor against [the defendant]. This is a case about the citizens and [the defendant]. Sometimes, that's easy to forget; but you should know that the citizens of the Commonwealth, while defendants are cloaked in certain fundamental constitutional rights, and that's something we all embrace, the citizens of the Commonwealth are equally entitled to a fair trial. I ask you to hold onto that fundamental principle as you listen, and deliberate later on."

This argument is problematic in two respects. First, the jurors, by definition, were themselves all "citizens of the Commonwealth," and the prosecutor's characterization of his role as representing the "citizens" ran the risk of suggesting that the prosecutor was representing the jurors-as-citizens against the defendant, and in that way misrepresenting or at least confusing the jurors' actual role as neutral fact finders charged with weighing all the evidence and determining whether the Commonwealth had proved the defendant's guilt beyond a reasonable doubt. Second and more fundamentally, the "Commonwealth" in a criminal case is not a shorthand way of referring to individual citizens, and is not just the name of the party on the other side of the "versus" from the defendant; the "Commonwealth" plays a different role, and so does its attorney. Although the Commonwealth is entitled to a fair trial, and although the prosecutor has the responsibility to argue the Commonwealth's case forcefully, "[n]evertheless, the fact remains that the prosecuting attorney 'is the

representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" Commonwealth v. Shelley, 374 Mass. 466, 472 (1978), quoting Berger v. United States, 295 U.S. 78, 88 (1935). The prosecutor's characterization of his role in this case as representing "the citizens" of the Commonwealth against the defendant, and the prosecutor's emphasis on the rights of "the citizens," was at best inappropriate, and far better left unsaid.

The majority of the prosecutor's argument was devoted to attacking the defendant's third-party culprit defense. In his closing, particularly near its beginning, the prosecutor repeatedly sounded the theme that the defense was seeking to mislead, confuse, and "prejudice" the jury with the presentation of this defense by presenting information that "lack[ed] materiality and relevance" -- information that should not even be called "evidence" because it was so lacking in these qualities.[28]

---

[28] For example, immediately after asking the jury to "hold onto" two fundamental "legal principles" -- namely, that the "citizens of the Commonwealth are equally entitled to a fair trial" and that "the Commonwealth does not have the burden of

proving that someone else did not commit the crime," the prosecutor argued:

> "It's important . . . [to keep these two principles in mind] because you've been exposed to information. I will not honor it by calling it 'evidence,' because evidence is presumed to have relevance and materiality. You've been exposed to information that has been advanced in an effort to do what real evidence is never supposed to do. It's not supposed to invite speculation. It's not supposed to divert your attention from the defendant who is on trial. It's not supposed to prejudice and confuse the fact finder -- that's you, the jury. And yet, I say with a high level of confidence, on behalf of the citizens, that that is exactly what the effort has been here.

> "It's been regrettable that the Commonwealth must respond to information that lacks materiality and relevance; but given the course of this trial, the Commonwealth is compelled to do so. . . . [W]hy do I say that this theory that's been advanced, this information that's been advanced, lacks materiality and relevance? It's because based on what you've heard . . . there is no link -- no link, no discernible link -- between James Webber and the murder of [the victim], or between Everett Carlson and the murder of [the victim]. Nothing you've heard or seen in this court room suggests that at all. In that sense, the Commonwealth asks you to think of James Webber and Everett Carlson as a couple of bowls of spaghetti that have been hurled against the wall in the desperate hope that some of it sticks.

> ". . .

> "What about the information you've heard about [Webber and Carlson] is not speculative, meant to divert your attention, and meant to confuse you?

> ". . .

> "How can you not conclude . . . that this information is simply an invitation to you to speculate, to engage in rank speculation, or meant to divert your attention or to confuse you?

> ". . .

"The opportunity to present third-party culprit evidence is of constitutional dimension, . . . because it is rooted in the right of criminal defendants to a meaningful opportunity to present a complete defense" (quotations and citations omitted). Scott, 470 Mass. at 327.  Pursuant to the trial judge's rulings, the defendant here was fully entitled to present evidence and argue his third-party culprit defense centered on James Webber and Everett Carlson.  Although the prosecutor was permitted to comment on the defense strategy and tactics, and was not beyond bounds in arguing that the strategy was intended to confuse, see, e.g., Commonwealth v. Raposa, 440 Mass. 684, 697 (2004), what may be permissible if stated once may become less so through constant repetition.  Although the prosecutor did not describe the third-party defense as a "sham," see Commonwealth v. Lewis, 465 Mass. 119, 130 (2013), and although he did not say that the defendant or his counsel were "intentionally misleading" the jury, see Commonwealth v. Fernandes, 436 Mass. 671, 674 (2002), his repeated characterization of the defense evidence as irrelevant and immaterial "information," unworthy of

"Do you get the impression . . . based on all of that inconsistent evidence, do you get the impression of what I suggested to you in the beginning -- the attempt to confuse you, and to confuse the issue?  This is stuff that should never have been heard by the jury.  It's irrelevant, and it's immaterial."

even being called "evidence"; his complaint that it was "unfortunate" the Commonwealth even had to respond to it; and his several rhetorical questions asking about the misleading and speculative nature of the third-party culprit defense (see note 28, supra) came close. These comments and questions both misstated the law -- the judge had specifically allowed the third-party evidence to be introduced as "evidence" -- and verged on suggesting that the entire third-party culprit defense was improper and should not have been presented.[29]

"In determining whether an error in closing argument requires reversal, we consider whether defense counsel made a timely objection; whether the judge's instructions mitigated the error; whether the error was central to the issues at trial or concerned only collateral matters; whether the jury would be able to sort out any excessive claims or hyperbole; and whether the Commonwealth's case was so strong that the error would cause no prejudice." Scott, 470 Mass. at 335, quoting Commonwealth v.

---

[29] The Massachusetts Guide to Evidence (2015) contains a section setting out in comprehensive fashion the principles governing proper and improper opening statements and closing arguments, and provides citations to relevant decisions of this court and the Appeals Court on these subjects. See Mass. G. Evid. § 1113 (2015). Particularly in light of the availability of this resource, going forward, there should be even less excuse than at present for prosecutors as well as defense counsel to stray beyond the bounds of proper argument.

Harris, 443 Mass. 714, 732 (2005).[30]  Here, the first three

factors weigh in the defendant's favor in whole or in part.  On

the first, the defense counsel objected both during and after

the Commonwealth's closing.[31]  As for the second factor,

mitigation of the prosecutorial error by the judge's

instruction, the judge overruled the defense counsel's objection

---

[30] See Commonwealth v. Lewis, 465 Mass. 119, 130 (2013):

> "When determining whether error in a prosecutor's
> closing argument requires reversal, we consider (1) whether
> the defendant seasonably objected; (2) whether the error
> was limited to collateral issues or went to the heart of
> the case; (3) what specific or general instructions the
> judge gave to the jury which may have mitigated the
> mistake; and (4) whether the error, in the circumstances,
> possibly made a difference in the jury's conclusion. . . .
> With respect to the fourth factor, we consider whether the
> jury, to whom we ascribe a certain level of sophistication,
> would be able to sort out a prosecutor's excessive claims;
> and we look to see if the Commonwealth's case was
> overwhelming" (citations and quotations omitted).

[31] The defendant's first objection followed the prosecutor's
suggestion, quoted in note 28, supra, to the effect that the
defense was seeking to confuse the jury with the third-party
culprit evidence and that such evidence should not have been
heard by the jury.

The second objection by the defense, lodged at the end of
the prosecutor's closing, was two-fold.  The defendant's trial
counsel objected to the prosecutor's remarks suggesting the
defense had "compromised" the Commonwealth's right to a fair
trial by raising a third-party culprit defense.  Counsel also
objected to the prosecutor's statements suggesting that the
defense had presented evidence that the jury should not have
heard.  He asked for curative instructions with respect to both
sets of remarks by the prosecutor, a request the judge granted
in part.  We discuss the judge's curative instruction in the
text, infra.

during the closing but, thereafter, the judge did give one limiting instruction after the prosecutor completed his closing, in partial response to the defendant's objections.[32] The instruction did help mitigate the prosecutor's improper misstatements belittling and mischaracterizing the evidence relied on by the defendant for his defense -- although it would have been appropriate, as the defendant had requested, to explain more directly the prosecutor's overreaching, and in particular to have addressed specifically the prosecutor's repeated assertions that the third-party culprit evidence was "irrelevant" and "immaterial."[33] Finally, on the third factor,

---

[32] The judge told the jury:

"It was suggested to you that certain testimony given in this court should only be considered by you as 'information,' and not as evidence in this trial. I've told you before, and I'm going to instruct you [hereafter], that sworn testimony given in this case is evidence, and you shall consider as evidence.

"You were also told that there was evidence that you never should have heard in this case, that you as the jury should not have heard in this case, and that it was irrelevant evidence. I've told you before that I rule on the admissibility of evidence, and anything that you heard in this case, I have ruled on -- in consultation with counsel, many times. I have ruled that the evidence that you heard is admissible; and that's the end of that story. You shall consider it as evidence."

[33] The judge declined to act on defense counsel's other request, that the judge explain to the jury that the defendant was entitled to raise a defense concerning the possibility of third-party culprits and his doing so could not be taken as interfering with the Commonwealth's right to a fair trial. A

the argument errors of the prosecutor related in whole or in part to the third-party culprit defense, which was the heart of the defense.

The final factor we consider concerns the strength of the Commonwealth's case:  does the strength eliminate the possibility of prejudice arising from the prosecutor's argument? The evidence leads us to conclude that the Commonwealth's evidence did so.  The DNA evidence unquestionably pointed to the defendant, and not Webber or Carlson (or anyone else), as the person responsible for the victim's death.  That is, there was no DNA evidence tying Webber to the victim, essentially none tying Carlson,[34] extremely little linking an unidentified person,[35] and the defendant was the sole source of the DNA located in the victim's rectum.  As indicated previously, the DNA evidence from the rectum by itself indicates only that the defendant had intercourse with the victim close to the time of

curative instruction with this substantive message would have been appropriate.

[34] One of the stains on the victim's underwear could have come from half of all males, including Carlson (as well as the defendant).  The statistical probability that Carlson was the source of the DNA on the stain is so low that it is virtually meaningless.

[35] As explained previously, one of the areas of the victim's underwear that was tested led to generation of a partial male DNA profile that did not match the defendant, Webber, or Carlson.  No further evidence covering the possibility of another possible culprit beyond these three was offered.

her death, not that he killed her.  However, when this DNA evidence is combined with (1) the absence of drainage on the victim's underwear, suggesting the victim had not pulled up her pants and underwear after intercourse and before she was killed; (2) bloodstains -- or what were certainly most likely to be bloodstains -- on the victim's hip, knee, and sneaker, all of which were consistent with the defendant's DNA, and one of which would have matched only one in 1.366 billion randomly selected Caucasians;[36] and (3) the fact that none of these fragile stains was smeared or disturbed in any way -- again suggesting the victim had not pulled up her pants and underwear -- the conclusion that the defendant killed the victim seems almost inescapable.[37]

---

[36] The defendant argues that it is a misstatement of the evidence to refer to the red-brown stains found on the victim's hip, right thigh-left knee area, and sneaker as bloodstains, as the prosecutor did in his closing.  We disagree.  All three stains found on the victim screened positive for blood, and one of them was confirmed as blood by additional testing.  Moreover, as summarized here in the text, all three stains were consistent with the defendant's DNA, one of them overwhelmingly so.  The prosecutor's argument on the point was proper, and the evidence strongly supports the verdict.

[37] The defendant also contended the prosecutor "improperly vouched on the evidence" in his closing.  The defendant points to the prosecutor's comment, "I say with a high level of confidence, on behalf of the citizens" that the defense was seeking to divert the jury with the third-party culprit defense. See note 28, supra, where the prosecutor's comment is quoted in full.  As discussed in the text, we consider the prosecutor's comment to have been improper, but vouching is not the issue. As the defendant points out, improper vouching occurs when the

In sum, there is no question the defendant had the right to advance a third-party culprit defense, and no question that the prosecutor's argument improperly sought to impugn that defense. But even considering the entire case through the lens supplied by G. L. c. 278, § 33E, we are persuaded that the DNA evidence pointing to the defendant as the person who killed the victim requires the conclusion that the defendant, in the end, was not prejudiced by the prosecutorial errors.[38]  A new trial is not warranted.

6.  <u>Jury instruction on third-party culprit evidence</u>.  The defendant also argues that the judge committed reversible error by declining to give the defendant's proffered instruction on the third-party culprit defense.  There was no error.

The judge instructed the jury:

"The Commonwealth does not have the burden of proving that no one else may have committed the murder, nor does the defendant have to prove that another person committed

---

prosecutor personally expresses a belief in the credibility of a witness.  See <u>Commonwealth</u> v. <u>Tu Trinh</u>, 458 Mass. 776, 786 (2011).

[38] It is also the case that most of the prosecutor's improper comments were made in the first part of his long closing.  (The prosecutor's closing lasted for approximately fifty minutes.)  Thereafter, the prosecutor principally focused his attention on the specifics of the trial evidence, and marshalled the evidence to refute the substance of the third-party culprit defense.  This was an eminently permissible and appropriate approach and, given the length of the closing, may have blunted the impact of the earlier improper comments.  It is important to consider the prosecutor's argument as a whole.  See <u>Commonwealth</u> v. <u>Rodriguez</u>, 437 Mass. 554, 565 (2002).

the offense charged.  The Commonwealth does have the burden to prove the defendant's guilt by proof beyond a reasonable doubt."

To date, this court has not held that where third-party culprit evidence is admitted, a judge is required to give an instruction on it, as long as the judge explains that "the Commonwealth's burden includes the obligation to prove beyond a reasonable doubt that the defendant committed the crime."  Commonwealth v. Hoose, 467 Mass. 395, 412 (2014).  The judge's instructions did this, and the quoted instruction at least specifically mentioned the type of evidence at issue.  Although giving the defendant's proposed instruction on third-party culprit evidence[39] would have been appropriate -- especially in

_____

[39] The instruction requested by the defense stated in relevant part:

"Although the defendant is under no obligation to prove his innocence, the defendant has raised the defense of other persons who you could find had motive, opportunity, or reason to have killed [the victim]. Although such persons are not on trial, the defendant has brought forward some evidence which might indicate that a third party, not the defendant, committed the crime for which the defendant is charged.  The defendant must show some evidence which, if believed, tends to directly connect a third party to the crime.  The defendant offers the third-party culprit testimony not to prove the guilt of the third party, but for your consideration as to the guilt of the accused.  You must consider if this evidence raises a reasonable doubt as to the defendant's guilt.  Keep in mind, however, that the defendant is not required to prove another person committed the crime.  On the other hand, the Commonwealth does not have the burden of proving that no one else may have committed the offenses.  In the end, the burden remains with the Commonwealth to prove the

light of the prosecutor's closing argument -- the judge was not required to do so.

7. <u>Review under G. L. c. 278, § 33E</u>.  We have reviewed the evidence and the trial record thoroughly and carefully pursuant to our obligation under G. L. c. 278, § 33E.  We conclude that the defendant's conviction of aggravated rape must be reversed, but find no basis for any additional relief.

8. <u>Conclusion</u>.  With respect to the charge of aggravated rape, the defendant's conviction is reversed, the jury's finding of guilt is set aside, and judgment shall enter for the defendant.  The defendant's conviction of murder in the first degree is affirmed.

<u>So ordered</u>.

---

defendant's guilt of the crime charged beyond a reasonable doubt."