In July, 2016, after an eight-day trial, a Superior Court jury convicted the defendant of rape, assault and battery on a family or household member, malicious destruction of property under $ 250, two counts of witness intimidation, and criminal contempt. The victim was the defendant's girl friend. On the defendant's appeal, we affirm.
Background. We summarize the relevant trial testimony. On June 11, 2015, at approximately 6 A.M. , the victim received an angry telephone call from the defendant in which he demanded that she meet him before work that day. Because her workday began at 7:30 A.M. , the victim met the defendant at about 6:30 A.M. , and he proceeded to tell her that he was "in control" of their relationship and to place conditions on her job as a dog groomer. For the next several hours the defendant's fury escalated, and he interrupted the victim's work on several occasions with various demands. In the early afternoon, the defendant, who had met the victim after she finished work, got into the passenger seat of the victim's car and ordered her to drive to Bird Park in Walpole. The victim was very scared, wanted to go home, and was crying, but she did as the defendant said.
When they arrived at the park, the defendant directed the victim to park at the end of the parking lot, furthest from the street. The victim testified that the defendant then left the car to use heroin in the woods, and took the car keys with him. When he returned, the defendant proceeded to take off his shirt, recline the passenger seat, pull down his shorts and underwear, and pull the victim towards him, kissing and groping her while she cried. When the victim told him to stop, the defendant pointed to his penis and said "go on," indicating to her that he wanted oral sex. When the victim said she didn't want to do that, he "clenched his fist and ... said, you do what I tell you to do." The victim repeated that she did not want to, but the defendant stated that he was the one in control, and, again, pointed to his penis. The victim felt she "had to give him oral sex," and she then did so while choking and crying. The victim was "terrified."
Afterwards, the defendant "nodded off" with his shorts still at his ankles, so the victim grabbed her cellular telephone (cell phone), ran across the parking lot, and called 911. When she was about halfway across the parking lot, she saw that the defendant was chasing her. She ran across the street and was "screaming for help" to people as they drove by. The defendant caught up to her, came up behind her and grabbed her with two hands, one on her forearm and one on her "shoulder/neck area." He eventually grabbed her cell phone from her and fled. The victim's cell phone was subsequently recovered, in several pieces, in a wooded area near Bird Park.
Several cars pulled over in response to the incident, and four individuals testified at trial about witnessing various parts of the altercation. Multiple witnesses called 911, and the victim waited for the police in the car of one of the women who had pulled over. When the victim got into the woman's car, the victim "was hysterically crying, just saying [the defendant was] going to kill [her]."
After approximately twenty minutes,[2] Walpole police Sergeant James O'Connell arrived and approached the car in which the victim was waiting. Sergeant O'Connell testified that at that point the victim was "extremely upset," "shaking," "huffing," "crying," "nervous of her surroundings," and "her voice was shaking." He also testified, over the defendant's objection, as to what the victim told him, including that during the assault, the defendant had "made a fist ... by [the victim's] face and said, give me a blowjob."
The defendant was ultimately apprehended and arrested. At trial, the victim explained that, after the attack, she "still loved [the defendant], and [she] wanted answers," so she put money into his canteen account and answered twenty-three of his phone calls from jail.[3] She also visited him twice in jail. However, the defendant continued his controlling and threatening behavior toward the victim, including pressuring her to sign an affidavit saying that she had made up the incident. Finally, upon receiving a menacing letter from the defendant that made her feel "terrified," the victim told the defendant in August of 2015 to "stop calling [her]," and she ended their relationship. Presumably to provide the jury with some degree of context for the victim's evolving attitude toward the defendant, the Commonwealth called a witness, Anthony Burns, to testify as an expert about the characteristics of domestic violence.
Discussion. The defendant raises three issues on appeal, which we address in turn.
1. Expert testimony. Burns was the coexecutive director of an intimate partner abuse education program called Common Purpose, where he had worked since 1993. The Commonwealth called him to testify as to common behaviors of individuals involved in domestic violence and the "cycle of violence" generally. He was not asked to apply his expertise to the facts of this case.[4] After conducting a voir dire of Burns, the judge qualified him as an expert over the defendant's objection. The defendant argues that the judge erred in doing so, on the grounds that Burns lacked the necessary credentials and experience. In particular, the defendant took issue with the fact that Burns possessed only an undergraduate degree in criminal justice, without any advanced degrees or publications.
"A trial judge has wide discretion to qualify an expert witness and to decide whether the witness's testimony should be admitted." Commonwealth v. Scesny, 472 Mass. 185, 194-195 (2015), quoting Commonwealth v. Frangipane, 433 Mass. 527, 533 (2001). "The admission of expert testimony will be reversed only where it constitutes an abuse of discretion or other error of law," and "the question for judicial decision is whether the witness has sufficient skill, knowledge, and experience in the area of his training to aid the jury" (citations omitted). Scesny, supra at 195. Further, it is well-established that "the pattern of behavioral and emotional characteristics common to the victims of battering lies beyond the ken of the ordinary juror and may properly be the subject of expert testimony." Commonwealth v. Goetzendanner, 42 Mass. App. Ct. 637, 642 (1997).
The judge did not abuse his discretion in qualifying Burns as an expert and allowing him to testify as to the cycle of domestic violence. We have routinely affirmed trial judges' decisions to qualify as experts in domestic violence witnesses who, although not trained clinicians or authors of academic publications, were "adequately qualified ... to testify about the particular psychological dynamics of domestic abuse and [battered woman's syndrome]," based on their extensive work experience. See Goetzendanner, 42 Mass. App. Ct. at 640-641 & n.4 (director of domestic violence agency with over ten years of experience in field, bachelor's degree in psychology, and experience training professionals on battered woman's syndrome was qualified expert). See also Commonwealth v. Morris, 82 Mass. App. Ct. 427, 430-431 (2012) (detective who specialized in domestic violence cases, had worked with "at least 480 victims," and trained other officers was qualified expert). Burns testified that he had worked with "over a thousand" victims since 1991, and conducted between forty and seventy trainings to educate police officers, social workers, correction officers, and victim witness advocates about intimate partner violence and "the dynamics of ... abusive relationship[s]." The judge did not err in determining that Burns had "sufficient skill, knowledge, and experience" to be able to "aid the jury" (citation omitted). Scesny, 472 Mass. at 195.
To some extent, it appears that the defendant's complaint is not about the judge's qualification of Burns as an expert, but rather about the substance of Burns's testimony. For example, the defendant suggests that Burns's testimony that domestic violence occurring in public is "an indication that the normal social norms don't apply and it's more severe" could be taken to imply that other violence by the defendant predated this episode. However, the defendant did not object to any such statements at trial, and our review therefore is limited to whether any error caused a substantial risk of a miscarriage of justice. See Commonwealth v. Almele, 474 Mass. 1017, 1018 (2016). Given the strength of the evidence here -- including, for example, a great deal of corroborating eyewitness testimony -- we are confident that no such risk was created.
2. Spontaneous utterances. The defendant next asserts that Sergeant O'Connell's testimony as to what the victim told him after the incident was inadmissible hearsay that was admitted in error. We disagree.
The judge's determination that the victim's statements to Sergeant O'Connell were spontaneous utterances is given "great deference," and we review only for abuse of discretion. Commonwealth v. Smith, 460 Mass. 385, 391 (2011). "A statement qualifies as a spontaneous utterance if there is an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer, and the declarant's statement was a spontaneous reaction to the occurrence or event and not the product of reflective thought" (quotations and citation omitted). Commonwealth v. Simon, 456 Mass. 280, 296 (2010). The defendant does not appear to contest that the first prong is satisfied; indeed, he acknowledges that the victim's statements to other witnesses following the incident, but prior to the sergeant's arrival, were spontaneous utterances. As for the second prong, courts consider factors such as "whether the statement was made in the same location as the startling event; the amount of time between the startling event and the making of the statement; and the age, spontaneity, and degree of excitement of the declarant." Commonwealth v. Wilson, 94 Mass. App. Ct. 416, 421 (2018).
Here, Sergeant O'Connell arrived at Bird Park -- the same location where the assault had taken place -- between fifteen and twenty-five minutes after the incident. When he arrived, the victim was "extremely upset," she was shaking and crying, and "her voice was shaking." When the eyewitness who had sheltered the victim in her car prior to the police arriving was asked whether the victim had "calm[ed] down" or "stay[ed] upset" in the time the witness was with the victim, the witness testified that "[the victim] stay[ed] upset" and "was just in hysterics." Further, the fact that the victim's statements to Sergeant O'Connell were in response to his questions does not preclude the statements from being spontaneous utterances. See Wilson, 94 Mass. App. Ct. at 421. In our view, the judge plainly did not make "a clear error of judgment in weighing the factors relevant to the decision ... such that the decision f[ell] outside the range of reasonable alternatives" (quotation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).
3. Evidence of force. To prove a charge of rape, the Commonwealth must prove beyond a reasonable doubt that the defendant "compel[led] [the victim] to submit by force and against [her] will, or compel[led] [her] to submit by threat of bodily injury." G. L. c. 265, § 22 (b ). The victim testified that the defendant told her he was the one in control, demanded that she perform oral sex -- after she had repeatedly stated she did not want to -- and "clenched his fist" "fairly close" to her body.[5] Thus, there was more than ample evidence of force to sustain the defendant's rape conviction. See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). See also Commonwealth v. Caracciola, 409 Mass. 648, 652-653 (1991) ("Those threats and the circumstances created by his conduct and his words are sufficient to constitute the force contemplated by the statute.... [T]he force needed for rape may, depending on the circumstances, be constructive force, as well as physical force, violence, or the threat of bodily harm").
Judgments affirmed.

The woman in whose car the victim waited testified that the police officer arrived twenty to twenty-five minutes later, but the sergeant testified that he arrived "[p]robably [fifteen] minutes maybe, tops" after the incident.

Portions of their phone conversations were admitted in evidence at trial. The victim also testified that she engaged in phone sex with the defendant.

In fact, Burns testified that, other than the names of the parties, which he was given in order to check for conflicts (there were none), he was unfamiliar with the underlying facts of this case.

The defendant points to testimony from the victim that the defendant's fist "wasn't up in [her] face," in contrast to Sergeant O'Connell's testimony that the victim told him the defendant's fist was "by her face." Putting aside the fact that we must consider the trial evidence in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), exactly where the defendant held his clenched fist is inconsequential. Indeed, the evidence was sufficient to sustain a rape conviction even without any testimony about the fist.