## Commonwealth *vs.* Joshua Lewis.

Norfolk. January 8, 2013. - May 14, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, & Duffly, JJ.

*Armed Assault with Intent to Murder. Firearms. Intent. Evidence,* Intent, Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Argument by prosecutor, Instructions to jury.

At the trial of indictments charging, inter alia, assault with intent to murder, the evidence at the close of the Commonwealth's case, viewed in the light most favorable to the Commonwealth, supported a finding that the defendant had formed a specific intent to kill. [124-126]

At a criminal trial, the judge did not err in allowing the Commonwealth, over objection, to offer in evidence an ambiguous statement made by the defendant after being shot by police, where the statement was admissible as the statement of a party opponent; moreover, error, if any, in the statement's potential aspect as evidence of a prior bad act did not create a substantial risk of a miscarriage of justice. [126-128]

At a criminal trial, the prosecutor's repeated use of the term "street thug," his reference to the "entire defense" as a "sham," and his accusation that defense counsel assisted in the presentation of lies constituted improper excessive argument warranting a new trial, where the defendant timely objected to each improper comment; where the comments went to witness credibility, the central issue of the case; where the judge's instructions to the jury did not address any improprieties in the prosecutor's closing argument and effectively implied that the argument was proper; and where, in the circumstances, it could not be said that the improper argument did not make a difference in the jury's conclusion. [128-133]

At the trial of indictments charging, inter alia, assault with intent to murder and carrying a firearm without a license, no prejudice arose from the hypothetical example used in the judge's instructions to the jury on the charge of assault with intent to murder. [133]

Indictments found and returned in the Superior Court Department on September 28, 2006.

The cases were tried before *Barbara A. Dortch-Okara,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Peter M. Onek,* Committee for Public Counsel Services, for the defendant.

*Marguerite T. Grant*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of assault with intent to murder, carrying a firearm without a license, possession of a firearm with a defaced serial number, and possession of a firearm while not in possession of a firearms identification card. The Appeals Court affirmed the convictions. See *Commonwealth* v. *Lewis*, 81 Mass. App. Ct. 119 (2012). We granted the defendant's application for further appellate review. He alleges error in (1) the denial of his motion for a required finding of not guilty as to the charge of assault with intent to murder, (2) the admission of an ambiguous statement he made after being shot by police, (3) the closing argument by the prosecutor, and (4) the judge's instruction on the charge of assault with intent to murder. We reverse the convictions because of the prosecutor's improper closing argument, and remand the matter for a new trial as to all charges.

1. *Facts.* The jury could have found the following facts. On July 26, 2006, State Troopers George Demos and Gregory Keane, both on duty, planned to meet at a restaurant in Stoughton at 6:30 P.M. for a break. Keane, a canine unit officer, arrived first with his dog. He waited in his cruiser for Demos. As Demos was approaching the restaurant in his cruiser, three occupants in a Nissan Maxima automobile ahead of him were looking back at him and making "excited" movements. The Maxima turned abruptly into the restaurant's parking lot without signaling. The Maxima passed Keane, who noticed that the inspection sticker depicted an "R," indicating the car had failed its last inspection. The Maxima proceeded to the restaurant's drive-through lane.

Demos stopped his cruiser near Keane's cruiser. They exchanged information about the Maxima and radioed for information about the car. They learned that its owner was at least fifty years old, older than the driver appeared to be. None of the occupants was wearing a seat belt. Trooper Demos followed the Maxima after it left the restaurant. He noticed the occupants were looking back at his cruiser, moving around, and dropping their shoulders. He activated his blue lights and the Maxima stopped. As Demos approached the car he smelled a strong odor of burnt marijuana emanating from its open windows. The occupants continued to move about inside the car.

Demos approached the front passenger door and requested the license and registration from the driver, Peter Le. As Le passed the documents to Demos "his hand was shaking dramatically." Demos asked why Le was so nervous. Le explained that he was not the registered owner of the Maxima. He said that his uncle, whose last name also was Le, was the owner. Demos said he smelled marijuana. The defendant, who was sitting in the rear seat, said, "I know you do, and we smoked in this car recently, but there is nothing in the car now. You would be wasting your time searching it."

Demos told the front seat passenger, Ren Pho, who appeared nervous, that he should be wearing a seat belt. He asked Pho for identification, but Pho said he did not have any. He asked Pho to step out of the car and then escorted Pho to the rear of the car where Demos pat frisked him. Demos discovered a black pistol in the waistband of Pho's jeans. He yelled to Keane, who was standing alongside Demos's cruiser, "[G]un, gun." Demos removed the gun[1] and threw it away from the Maxima after he "yanked" Pho to the ground. Demos drew his service weapon and pointed it at Pho. The defendant opened the driver's side rear door and started to step outside the car. Demos yelled for him to get back inside, but the defendant fled. As he ran across the street, Demos pursued him with his service weapon in hand, yelling repeatedly for the defendant to stop.

The defendant grabbed his waistband with his right hand and looked back at Demos as he ran. When he reached the parking lot of a business across the street he reached into his right front pocket, pulled out a brownish-silver gun, and began turning toward Demos. Demos yelled, "Drop the gun," and "Stop or I'll shoot." While turning, the defendant pointed the gun at Demos. Believing his life to be in danger, Demos fired two rounds at the defendant. The defendant yelled, "You shot me," but remained standing. He continued to point his gun at Demos, who took cover behind a rock and fired a third shot. It struck the defendant in the leg, and he fell on his back. Demos believed that the defendant's leg was broken, based on the unnatural position in which it was bent behind him after he fell.

Demos kept yelling for the defendant to "drop the gun." The

[1]Trooper Keane testified that the gun was "dark-colored."

defendant put his gun partway into his right front pocket and raised his hands. Demos emerged from behind the rock and radioed for assistance and an ambulance. He then handcuffed and pat frisked the defendant. He removed the gun from the defendant's pocket and tossed it aside. Demos administered first aid to the defendant until an ambulance arrived. The defendant was taken to a hospital where he was treated for gunshot wounds to his right forearm, right hip, and left buttock (the last fractured his left leg).

A bystander, Dennis DeNapoli, identified himself to Demos as the president of the Brockton city council. Demos directed DeNapoli to put his foot on the defendant's gun. Trooper Keane retrieved the gun, unloaded it, and secured it in his cruiser. The magazine contained eight live rounds, one of which was hollow point, designed to expand on impact. There was no bullet in the chamber. The gun, a .38 caliber semiautomatic Colt pistol, capable of being fired, had a defaced serial number. No fingerprint was detected on the gun. Only three to six per cent of all firearms examined bear sufficient ridge detail to discern an individual fingerprint.

Le was taken into custody by an off-duty sergeant with the Ashland police department, who happened by and offered his assistance to Trooper Keane. Pho was handcuffed by Keane, who also retrieved Pho's gun, unloaded it, and secured it in his cruiser. Pho's gun, a .38 caliber semiautomatic Beretta pistol, capable of being fired, had twelve live rounds in the magazine. Some were hollow point. When Pho was pat frisked by Keane, he had fifty pills packaged in five plastic bags, containing methamphetamines, a class B controlled substance.[2] Four baggies containing 34.64 grams (more than one ounce) of marijuana were found in the center console of the Maxima.[3] The defendant had a twenty-dollar bill and other bills of unknown denomination on his person.

---

[2]Ren Pho was convicted of possession of a firearm without a firearms identification card, unlawful possession of ammunition, and possession with intent to distribute a class B controlled substance. The charges related to the Beretta pistol, the ammunition in the magazine, and the pills found on his person, respectively.

[3]Peter Le was convicted of possession with intent to distribute the marijuana found in the console.

2. *The defense.* The defense theory was that Pho had possession of both guns and Demos took the Colt pistol and planted it near the defendant after the shooting. The defense called Pho, who testified that he had both guns just before the Maxima was stopped. The Beretta pistol, which is completely black, was in his left pocket. The Colt pistol, which is brownish-silver, was in his right waistband. Pho said that, as the Maxima was pulling over, he removed the black Beretta from his pocket and it fell between the passenger door and seat. He said that when Trooper Demos opened the door and told him to step out of the car, the Beretta fell to the ground. At that point Demos yelled, "[G]un, gun." Demos then pat-frisked Pho and found the Colt pistol, which he seized. The defendant fled, and Demos pursued him with the Colt in his hand. Pho said Demos started shooting as the defendant was running, and the defendant was trying to pull up his pants as he ran. He did not see a weapon in the defendant's hand. Pho admitted on cross-examination that he previously told police that the black gun was his when asked, "Which gun is yours?" He testified that he responded in that manner because police had threatened him with physical harm.

Le also testified for the defense. He said that the defendant was pulling up his pants as he ran from Demos because they were baggy and kept falling down. He claimed the defendant never had a gun in his hand.[4] Both Pho and Le were impeached by prior convictions, including those described at notes 2 and 3, *supra.*

A bystander, Sean Donovan, testifying for the defense, said he walked by the defendant twice shortly after the shooting. The first time, he did not see a gun on the ground near the defendant. The second time, he saw an officer standing over the defendant and a gun was on the ground within an arm's length of the defendant.

The defendant introduced his medical records, indicating that a bullet entered his left buttock and broke his left leg. A second bullet entered the back of his right arm near the elbow. A third

---

[4]Le testified that Trooper Demos found a gun with a "black grip" in Pho's waistband and threw it to the ground. The handle of the Beretta is completely black. The handle of the Colt has black panel inserts surrounded by the brownish-silver metallic frame of the gun.

bullet entered his abdomen near his right hip. Bullet fragments were found in each wound. This, he argued, contradicted Demos's testimony that the last shot, the one to the leg, struck the defendant as he was facing Demos. The defendant also argued that the medical records supported his theory that Demos shot him as he was running, with his back to Demos.

The defendant also argued that Demos ignored Keane's offer of a more prudent course: to let his dog apprehend the fleeing defendant, as the dog had been trained to do. At that point in time, he argued, Demos was pursuing and shooting at a man who, at most, could only have been cited for not wearing a seat belt.

The defendant contended that there was a police conspiracy to cover up Demos's shooting of an unarmed man, the defendant. He based his theory on Demos's failure to file a form SP376, concerning the discharge of an officer's weapon; the absence of any fingerprints on the Colt; gaps in the forty-one minute "turret" tape recording containing State police radio transmissions; the fact that no police report of the incident was filed for two weeks; and the fact that the reports purporting to be those of Demos and Keane had been prepared by a third trooper.

The Commonwealth called Trooper Keane in rebuttal. He testified that when he brought a first aid bag to Demos, who was attending to the defendant, he asked the defendant how old he was. The defendant told Keane, "It doesn't matter . . . . I'll beat this. I'll beat this again."

3. *Motion for a required finding of not guilty.* The defendant asserts error in the denial of his motion for a required finding of not guilty as to the crime of assault with intent to murder. In particular, he contends that the evidence was insufficient to establish the element of a specific intent to kill. The defendant points to evidence that he did not shoot at Demos, the absence of evidence of (a) any history of animosity between himself and Demos, (b) prior bad acts that he had engaged in violent behavior toward anyone, (c) any threatening words directed at Demos or Keane, even after the defendant had been struck by two bullets fired by Demos, (d) a bullet in the chamber of the Colt pistol, and (e) any preparation of the gun to fire by drawing the slide

to strip a live round from the magazine and inserting it in the chamber. The Commonwealth, in turn, relies on evidence of the defendant's flight after Demos discovered a gun on Pho, his refusal to stop on command, evidence that the defendant pointed a loaded gun with a defaced serial number at Demos, and evidence that Demos believed the defendant was going to kill him.

The elements of the crime of assault with intent to murder are (1) an assault, (2) a specific intent to kill, and (3) malice, which, in the context of this crime, is the absence of justification, excuse, and mitigation. See *Commonwealth* v. *Moran*, 453 Mass. 880, 884 (2009). It is the second element, specific intent to kill, that is at issue in this appeal. We must determine whether, viewing the evidence at the close of the Commonwealth's case in the light most favorable to the Commonwealth, the jury rationally could have found beyond a reasonable doubt that the defendant had the specific intent to kill Demos. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). We conclude the jury could have so found.

"Direct evidence of a person's specific intent is not always available, but may be inferred from the facts and circumstances presented." *Commonwealth* v. *Moran*, *supra* at 885, and cases cited. The Commonwealth's reliance on evidence that Demos thought the defendant was going to kill him, citing *Commonwealth* v. *Moran*, *supra*, is inapt. The victim's state of mind in that case was not considered on the question of the defendant's intent. A victim's state of mind is admissible to show a defendant's intent only in limited circumstances, not present here. See, e.g., *Commonwealth* v. *Smith*, 461 Mass. 438, 449 (2012); *Commonwealth* v. *Qualls*, 425 Mass. 163, 169 (1997), *S.C.*, 440 Mass. 576 (2003) (evidence that murder victim feared defendant, even if made known to defendant, not probative of defendant's motive to kill). Demos's state of mind may have been relevant to the element of assault. Cf. *Commonwealth* v. *Henson*, 357 Mass. 686, 688-690, 693-694 (1970) (pointing loaded, or unloaded, firearm at someone in circumstances that place such person in reasonable apprehension of receiving immediate battery may satisfy elements of crime of assault by means of dangerous weapon); *Commonwealth* v. *White*, 110 Mass. 407, 409 (1872) (pointing loaded gun at person who sup-

poses gun is loaded and thereby reasonably fears bodily harm constitutes assault). However, in these circumstances, it was not relevant to the question of the defendant's specific intent to kill. Thus, although the jury would have been warranted in concluding that Trooper Demos reasonably believed his life was in danger if they concluded the defendant pointed a gun at him, such evidence is not probative of the defendant's specific intent to kill. *Commonwealth* v. *Smith, supra.*

Evidence that the defendant refused to comply with Trooper Demos's orders to stop and to drop the gun, and that he turned and pointed a loaded gun at Demos, might imply an intent to kill, but it equally implies an intent to frighten and deter. See generally *Commonwealth* v. *Bianco,* 388 Mass. 358, 363-364, *S.C.,* 390 Mass. 254 (1983). Thus, more was needed. However, even if the defendant only intended to frighten Demos when he first pointed the gun at him, the jury reasonably could infer that the defendant's intentions changed after Demos shot him. Having failed to deter Demos in his pursuit, having failed to avoid apprehension by pointing a gun at Demos, and having been shot twice, the defendant's refusal to surrender and his persistence in pointing a loaded gun at the man who had just wounded him with lethal force were circumstantial evidence from which the jury could infer that, at that juncture, the defendant had formed a specific intent to kill Demos. Although not inescapable, such an inference was warranted by the evidence, and it would have been reasonable. See *Commonwealth* v. *Marquetty,* 416 Mass. 445, 452-453 (1993).

The evidence was sufficient for the jury reasonably to conclude that the defendant formed the specific intent to kill. The Commonwealth was not required to show that the defendant actually fired the gun. Cf. *Commonwealth* v. *Lopez,* 383 Mass. 497, 500 (1981) (conviction of armed assault with intent to murder required neither evidence of battery nor evidence that weapon was used). Similarly, there is no requirement that the defendant actually chamber one of the rounds of ammunition. There was no error in the denial of the motion for a required finding of not guilty.

4. *Defendant's statement to Keane.* The defendant stated in response to a question from Trooper Keane about his age, "It

doesn't matter. . . . I'll beat this. I'll beat this again." The judge ruled that the statement could not be admitted in the Commonwealth's case-in-chief, but if the defendant were to present evidence that Trooper Demos planted a gun near the defendant to justify the decision to shoot him, then the statement might be admissible as consciousness of guilt. After the defense proceeded with the theory that Demos planted the gun, the judge allowed the Commonwealth, over objection, to offer the statement in evidence. The defendant argues that the statement was admitted in error because it was too ambiguous to be probative of consciousness of guilt. He contends that the statement, if offered as consciousness of guilt, suggests he had evaded punishment for some prior nefarious activity. He further contends that the statement is equally consistent with a protestation of innocence, i.e., that he previously had been *wrongly* accused of nefarious activity and was exonerated. Hence, he argues, the statement was ambiguous. To the extent his statement is an unequivocal denial of guilt, he argues, it is not admissible in evidence. See *Commonwealth* v. *Nawn*, 394 Mass. 1, 4 (1985).

The defendant's argument is fatally flawed. His response to Keane's question was indeed ambiguous. Because it was ambiguous, its meaning was for counsel to argue and the jury to determine. The defendant's statement was admissible as the statement of a party opponent. See *Commonwealth* v. *Marshall*, 434 Mass. 358, 365 (2001). It was not an unequivocal, and therefore inadmissible, denial of guilt. See *Commonwealth* v. *Nawn*, *supra*. See also *Commonwealth* v. *Cancel*, 394 Mass. 567, 571 (1985), and cases cited. It was an equivocal response that could be construed as self-incriminating and therefore admissible. *Id.* at 570-571, quoting *Commonwealth* v. *Machado*, 339 Mass. 713, 715-716 (1959). See *Commonwealth* v. *McNulty*, 458 Mass. 305, 329 n.23 (2010). Its meaning properly was a question of fact for the jury.

Although the issue is not argued on appeal, because the word "again" in the defendant's statement connotes a prior bad act rather than consciousness of guilt, and because there was no evidence of any prior bad act of the defendant, the jury might have been left to speculate as to the particulars of any such bad act. It would have been preferable had trial counsel requested

and the judge permitted the word "again" not to be admitted in evidence. However, we perceive no substantial risk of a miscarriage of justice. The prosecutor argued the consciousness of guilt aspect of the statement, not its potential aspect as evidence of a prior bad act.

5. *Prosecutor's closing argument.* The defendant asserts that the prosecutor misstated evidence and unjustifiably demeaned the defense, the defendant, and defense counsel in his closing argument, thereby depriving him of a fair trial. Defense counsel timely objected and moved for a mistrial. The judge determined there was no basis for the objections and denied the motion.

Early in his closing argument the prosecutor set the stage with this introduction:

> "I would suggest to you that the facts of this case show you at least one thing clearly, and that is how dangerous it is to be a state trooper or to be a police officer. On this date, Trooper Demos stopped a motor vehicle. It was just a routine traffic stop. There are three individuals in that vehicle. He and Trooper Keane told you about that. He has no way of knowing whether those three people are three people that are just coming from MIT in a study group or if they're *three street thugs* with guns and drugs, and that's how it turned out on this date" (emphasis added).

The prosecutor developed the "street thug" motif, stating shortly thereafter:

> "There's no gray issues here now. You either believe [the Commonwealth's witnesses] or you don't . . . . You either believe them or you believe the other side. There's nothing in between. Either the gun was planted or the gun was on him. And that's where it was, I'd suggest to you, on the *street thug*" (emphasis added).

After explaining that the defendant was running away to reach some nearby woods to dispose of the gun and thereby avoid a firearms charge, the prosecutor declared:

> "The *entire defense* in this case, I'd suggest to you, is a *sham*" (emphases added).

The prosecutor returned to the street thug motif three more times:

"And you'll also see, if you look at that video again, the wad of money in his front pocket. Of course, all us unemployed people have a big wad of money in our pocket. Where's my money? They are *street thugs* who are out, and what they're going to do with those guns, luckily, we didn't get a chance to find out" (emphasis added).

Later, the prosecutor interjected:

"It's the arrogance of the *street thugs* that gets you in this case" (emphasis added).

He concluded his argument with the following comments:

"Well, he's not going to beat anything. Nothing. Because the *street thugs* aren't deciding this case. You are. And the credible evidence, the believable evidence in this case shows that this man had a gun. This man had ammunition. The gun that he had was defaced and he intended to shoot the trooper with it. That's what the credible evidence shows. To disbelieve that, you have to believe that Trooper Demos is lying, Trooper Keane is lying, the off-duty Officer Ellis is lying, Lieutenant Shea is lying, Trooper Arnold's lying, all of these troopers are lying. LeBlanc, who you heard from today, he's lying. The whole lot of them.

*"The lies here came from there. As you look over all of this evidence, I suggest to you that will be obvious to you that the lies came from this table. And I'm not leaving out the attorney either, the questions that were asked and the way they were posed."* (Emphases added.)

A prosecutor may argue "forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Generally, it is improper for a prosecutor to "refer to the defendant's failure to testify, misstate the evidence or refer to facts not in evidence, interject personal belief in the defendant's guilt, play on racial, ethnic, or religious prejudice

or on the jury's sympathy or emotions, or comment on the consequences of a verdict" (footnotes omitted). *Id.* at 516-517. More specifically, we have said that it is improper for a prosecutor to argue that the "whole defense" is a "sham." *Commonwealth* v. *McCravy*, 430 Mass. 758, 764 (2000). A prosecutor may address a particular point in defense counsel's closing argument as a sham, but he may not characterize the entire defense as such. *Id.* We also have said that it is improper for an attorney in closing argument to disparage opposing counsel personally, or characterize counsel as "obscuring the truth or intentionally misleading the jury." *Commonwealth* v. *Fernandes*, 436 Mass. 671, 674 (2002). See *Commonwealth* v. *McColl*, 375 Mass. 316, 324 (1978).

It is improper for a prosecutor to use insulting names designed to evoke an emotional, rather than a rational, response from jurors. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 556, cert. denied, 537 U.S. 942 (2002), *S.C.*, 456 Mass. 490 (2010). Similarly, it is improper to refer to a defendant with epithets that suggest he has a criminal record where the evidence does not support such a finding, or invite the jury to decide the case on general considerations. See *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 402 (1975); *Commonwealth* v. *Worcester*, 44 Mass. App. Ct. 258, 264-265 (1998). It is improper to encourage the jury to find a defendant guilty by virtue of his association with known criminals. See *Commonwealth* v. *Lombard*, 419 Mass. 585, 592 n.6 (1995). The Commonwealth concedes, wisely, that the prosecutor's repeated use of the term "street thug," his reference to the "entire defense" as a "sham," and his accusation that defense counsel assisted in the presentation of lies constituted excessive argument. We view these aspects of the prosecutor's closing argument as improper, and the issue has been preserved for our review. We proceed to the question of prejudice.

When determining whether error in a prosecutor's closing argument requires reversal, "we consider (1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave to the jury which may have mitigated the mistake; and (4) whether the error, in the

circumstances, possibly made a difference in the jury's conclusion." *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000), citing *Commonwealth* v. *Kozec*, *supra* at 518. With respect to the fourth factor, we consider whether the jury, to whom we ascribe a certain level of sophistication, would be able to sort out a prosecutor's excessive claims; and we look to see if the Commonwealth's case was overwhelming. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 500 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998).

Applying these factors, we note that as to the first factor, the defendant timely objected to each improper comment. The second factor also favors the defendant. The prosecutor's comments were not limited to collateral matters, but went to the central issue of the case, witness credibility. As the prosecutor argued, the jury had a clear choice: which version of the facts to believe. The testimony of Pho and Le that the defendant did not have a gun was diametrically opposed to the testimony of Demos. Other than Demos, only DeNapoli testified that he saw a gun in the defendant's hand.

Keane was not in a position to see whether the defendant had a gun at the time of the shooting. He had not seen a gun in the defendant's hand or observed the defendant act in a threatening manner toward Demos prior to the shooting. There was no evidence that Keane, or any witness, heard Demos yell for the defendant to "drop the gun." Testimony indicated only that witnesses heard Demos yell "Stop," or "Stop, or I'll shoot." No witness except DeNapoli saw the defendant turn and face Demos. Two other civilians called by the Commonwealth testified that they heard the shots as the defendant was running.

The third factor — the judge's instructions — also weighs against the Commonwealth. The judge did not address in her instructions any improprieties in the prosecutor's closing argument. Instead, she gave a standard instruction about the role of counsel in closing arguments. By instructing the jurors, however, that "[t]he attorneys' arguments are intended to assist you in understanding the evidence and their contentions," she effectively implied that the prosecutor's argument was proper. See *Commonwealth* v. *Young*, 399 Mass. 527, 531 (1987); *Commonwealth* v. *Cobb*, 374 Mass. 514, 521 (1978).

We turn to the fourth factor, the question of prejudice, that is, whether "the error in the circumstances possibly ma[d]e a difference in the jury's conclusions." *Commonwealth* v. *Kozec*, *supra*. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). Contrary to the Commonwealth's assertion, the case against the defendant was not overwhelming. The witnesses, particularly the civilian witnesses, were conflicted as to whether the defendant had a gun in his hand when pursued by Demos, whether he turned and faced Demos, and whether he was shot while running or after he turned and faced Demos. None of the witnesses testified to hearing Demos yell "drop the gun," or words to that effect. In addition, the medical records, which indicated two wounds to the defendant's backside, gave greater support to the defendant's theory of being shot while in the act of running.

The prosecutor's improper comments were extensive and provided the structure and thrust of his entire closing argument. Its powerful crescendo culminated in a condemnation of defense counsel as a liar among liars. Stated otherwise, this is not a case in which a fleeting, isolated, improper statement in an otherwise proper argument could, in the context of the entire closing argument, be deemed nonprejudicial. See, e.g., *Commonwealth* v. *Burgos*, 462 Mass. 53, 72, cert. denied, 133 S. Ct. 796 (2012). Here, the tenor of the entire closing argument of the prosecutor improperly disparaged the defendant and counsel, and invited the jury to decide the case irrationally and on general terms. The prosecutor invited the jury to speculate about crimes as yet uncommitted by these three "thugs." The prosecutor invited the jury to speculate that the wad of cash in the defendant's pocket, the amount of which was unknown, was obtained through illegal means. He also invited the jury to find the defendant guilty by virtue of his association with Le and Pho. These invitations remained unchecked by the judge.

The Commonwealth contends that the prosecutor was merely responding to improper arguments by defense counsel. We disagree. If defense counsel made an improper argument, the prosecutor generally is well advised to object and request a curative instruction. See *Commonwealth* v. *Kozec*, *supra* at 519 & n.9. Defense counsel's improper argument does not furnish

the prosecutor "a license to indulge in improper argument." *Id.* at 519 n.9. In any event, "no matter how inappropriate defense counsel's closing argument may have been, it probably will have no bearing either in defining the proper limits of the prosecutor's argument or in assessing the defendant's chances on an appeal challenging the prosecutor's closing argument." *Id.* at 519-520. The prosecutor's argument was highly improper, and we cannot say that it did not influence the jury. The defendant is entitled to a new trial.

6. *Jury instructions.* The defendant assigns error to the judge's instruction on the charge of assault with intent to murder, focusing specifically on her example that "pointing a gun at a person may constitute an assault." The defendant had requested the judge to give the model instruction, which she gave with slight modification.[5] See Massachusetts Superior Court Criminal Practice Jury Instructions § 2.19, at 2-142 & n.8 (Mass. Cont. Legal Educ. 1999), citing *Commonwealth* v. *White*, 110 Mass. 407, 408-409 (1872). The defendant objected after the judge gave the modified instruction, contending that the example of a gun should not have been used in this case, and that "a different weapon" should have been used in her example.

"Hypothetical examples that illustrate a legal doctrine can be very useful to the jury, but, as defense counsel appreciated, they can sway the jury if the specifics of the illustration are virtually identical to one party's version of the facts of the case." *Commonwealth* v. *Fisher*, 433 Mass. 340, 346 (2001). Even assuming the question to have been preserved, there was no prejudice. The defense was not that the defendant did not mean to assault Demos. The defense was that he never pointed a gun at Demos. At the retrial, we are confident that, if an example is used in the instruction, it will not be a gun.

Accordingly, the judgments are reversed, the convictions are set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

---

[5]The judge's instruction omitted the word "unloaded" from the example in the model instruction.