NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10505


COMMONWEALTH  vs.  PIERRE P. CADET.



Plymouth.      April 10, 2015. - November 18, 2015.


Present:  Gants, C.J., Botsford, Duffly, Lenk, & Hines, JJ.


Homicide.  Constitutional Law, Public trial, Assistance of
     counsel.  Practice, Criminal, New trial, Public trial,
     Assistance of counsel, Argument by prosecutor, Hearsay,
     Instructions to jury, Capital case.  Evidence, Hearsay,
     State of mind.  Protective Order.  Self-Defense.




Indictment found and returned in the Superior Court
Department on December 17, 2004.

The case was tried before by Frank M. Gaziano, J., and a
motion for a new trial, filed on March 28, 2013, was heard by
him.


James M. Doyle for the defendant.
Mary Lee, Assistant District Attorney, for the Commonwealth.


DUFFLY, J.  In May, 2007, the defendant was convicted by a

Superior Court jury of murder in the first degree on the theory

of extreme atrocity or cruelty in the stabbing death of his girl

friend, Betina Francois.  At trial, the defendant did not contest

that he had stabbed the victim, but argued that he had done so in self-defense, after she became enraged and attacked him with two knives. In March, 2013, while his appeal from his conviction was pending, the defendant filed in this court a motion for a new trial; the appeal was stayed, and the motion was remanded to the Superior Court. The defendant's appeal from the denial of that motion was consolidated with his direct appeal.

We conclude that, although there were improprieties in the prosecutor's conduct at trial, including in his cross-examination of the defendant and in his closing argument, they did not create a substantial likelihood of a miscarriage of justice. Accordingly, we affirm the defendant's conviction and the denial of his motion for a new trial. Having conducted a thorough review pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to reduce the verdict or to order a new trial.

Background. We recite some of the facts that the jury could have found, reserving additional facts for discussion of the issues raised.

1. Commonwealth's case. At the time of the victim's death in late September, 2004, she and the defendant had been involved in a romantic relationship for three years. They had purchased a triple-decker house in Brockton in 2002, and lived there in the first-floor apartment. The relationship changed notably in January, 2004, after an argument during which the defendant hit

and shoved the victim. The victim obtained an abuse prevention order against the defendant, but the relationship, although volatile, continued. Notwithstanding the abuse prevention order, the victim and the defendant generally lived together in the same apartment, while sometimes living apart for a few weeks at a time.[1] They had numerous arguments, but still socialized together. After the victim was involved in an automobile accident in April, 2004, the victim and the defendant shared the use of his automobile until September, when the victim purchased another vehicle. They drove each other to and from work and school, and brought each other lunch. The victim invited the defendant to events at her workplace, and, in the spring and summer of 2004, they went on various trips out of State and to Canada, including trips to visit relatives in New York.

In July, 2004, the victim's family, friends, and coworkers began noticing injuries on her body and on her face, including bruises, black eyes, and bite marks. They also noticed that the defendant often telephoned the victim many times a day, and that at times she appeared upset after his calls.[2] In late July or

---

[1] The defendant's name remained on the mailbox in the front hallway, his automobile routinely was parked near the house, and neighbors reported seeing him regularly. He also performed maintenance work on the neighbors' apartments.

[2] Some of the victim's relatives testified that the victim rarely telephoned the defendant, and many testified that she never telephoned the defendant. However, telephone records from

early August, 2004, the victim's family helped her remove the defendant's belongings from the apartment, and change the locks. The defendant was angry at the way he felt the victim's relatives were treating him as a result of her statements to them about the relationship. Twice thereafter, the defendant attempted to break into the apartment. In August, 2004, he was charged with violating the abuse prevention order, but the victim resumed allowing him to stay in the apartment, and went on several more trips with him, to Florida and New York. Sometime that month, the victim's sister's husband had an encounter with the defendant during which the defendant said that he planned to teach the victim "a lesson." In late August, 2004, one of the victim's friends stayed with her for five days; during that time, the defendant made "innumerable" calls to the victim and, on two nights, came to the victim's house unexpectedly in the middle of the night, banging on the door and fleeing when police were called. The defendant then resumed spending nights in the apartment, and socializing with the victim.

On Sunday morning, September 26, 2004, neighbors saw the defendant and the victim, who were "dressed for church," leave

---

the victim's cellular telephone showed that she often called the defendant many times per day, at some points more than fifteen times in a day; in his decision on the defendant's motion for a new trial, the judge noted that the telephone records introduced at trial "demonstrated continuous incoming and outgoing telephone calls between the defendant and the victim."

the apartment.  Their vehicles, which had been parked side by side in front of the house at 7 A.M., were gone for much of the day, and returned at approximately 5 P.M. in the afternoon. Later, one neighbor saw the defendant, still dressed in a suit, carrying out trash; another neighbor noticed that the defendant's vehicle was parked one-half block away from the house, in a location where she had never before seen him park.  Around 7:30 P.M. that evening, the defendant and the victim were both in the apartment.  As the neighbors who lived in the apartment above were walking up the back stairs to their apartment and passing the victim's kitchen door, they heard the victim say, in an "irritated" voice, "What the fuck is this?  I'm not going to take this bullshit anymore."  She then said, "I swear to God, I swear to God," and then, "Leave me alone" three times.  Approximately ten minutes later, loud music began playing inside the apartment. Shortly after the music started playing, a neighbor saw the victim's automobile backing out of the driveway "very fast," and being driven away.  When one of the neighbors noticed the victim's automobile leaving, she called the victim's cellular telephone to complain about the loud music, thinking that the victim had forgotten to turn it off, but there was no answer. The music played until at least 11 P.M., but the victim did not answer repeated calls to her cellular telephone.

At approximately 9 P.M., the defendant, driving the victim's sport utility vehicle (SUV) was involved in a single-vehicle roll-over accident in Exeter, Rhode Island. The SUV had been traveling at over one hundred miles per hour when it left the highway, traveled through a wooded median, and flipped over, landing on its roof and throwing the defendant onto the shoulder of the road.[3] Rhode Island State police officers responding to reports of the accident found the defendant, unresponsive and bleeding, lying face down in the breakdown lane; there was blood nearby. The defendant was identified by documents in his pocket.

Emergency room staff determined that the defendant had at least two injuries to his neck, including a "tracheal laceration between the first and second tracheal ring . . . under the voice box" and a "right internal jugular vein laceration." The defendant also had a wound in his stomach, and a knife wound on his left palm. The wounds were not consistent with having been obtained as a result of the motor vehicle accident.[4] The

---

[3] A Rhode Island State police trooper testified that the absence of skid marks on the highway where the vehicle left the road was inconsistent with the driver having lost control of the vehicle while attempting to avoid an obstacle in the road.

[4] Later investigation of the sport utility vehicle (SUV) showed no blood on the steering wheel, the gear shift, or the inside or outside of the driver's door handle; there was blood on the defendant's cellular telephone, found in the vehicle, and on the driver's side headliner attached to the inside roof of the vehicle. A Brockton police detective testified that the detectives had expected a great deal more blood in the SUV,

defendant underwent two surgeries that night to repair damage from the injuries.  Telephone records showed that during the course of his drive from Brockton to Rhode Island, the defendant made at least twenty-one calls from his cellular telephone in an attempt to reach his brother, including numerous calls to his brother's friend's cellular telephone, as well as calls to the friend's land-line and to a cellular telephone belonging to the friend's wife.

Hospital staff contacted Rhode Island State police about the defendant's injuries, which they believed were knife wounds, and Rhode Island troopers notified the Brockton police.  On the morning of September 27, 2004, after learning that the victim had an active restraining order against the defendant, Brockton police went to the victim's house to perform a well-being check. They found the victim's body on the couch in the living room. She had been stabbed nine times, in the chest, neck, and upper left arm.  At least four of the wounds could have been fatal. The wound to the arm could have been consistent with being a defensive wound that the victim sustained while attempting to block a blow.  Police found a bloody knife blade on the floor

because it appeared to have been a "major accident," and the absence of a large amount of blood was not consistent with what they had learned about the nature of the defendant's injuries from Rhode Island State police troopers and hospital staff. Troopers searched the area of the crash for evidence of a weapon, but no knife or other weapon was found.

near the couch, a knife handle on the couch near the victim, and an unbroken knife in a crevice in the couch. Later testing showed that blood on the knives and elsewhere in the living room, including the victim's jeans, contained deoxyribonucleic acid (DNA) from both the victim and the defendant. The defendant's DNA was also present in small bloodstains on the kitchen floor and the dining room table.

Police found a note written by the defendant on a coffee table near the victim's body. The note began, "To everyone who does not know the life that I've been living with [the victim] for [three] years. I've had enough." It stated that the victim had called the defendant as he was driving home from church and asked him to come to the apartment as soon as possible, but when he arrived, the victim started arguing with him and threatened to call the police. The note also said that the victim and her family were trying to destroy the defendant's life, that he did not deserve to be in prison, and that his life was "already over."

2. Defendant's case. The defendant testified in his own defense. He said that when he arrived at the apartment, the victim wanted to discuss their relationship but he wanted to work on a paper for one of his college courses. The victim became angry and threatened to call police, saying that she would "destroy his life." He piled his clothes and books near the back

door, preparing to leave, but she would not let him leave the apartment. As he passed by her to return from the kitchen to the living room, she swung a knife with one hand, cutting his neck. Moments later, in the living room, the victim "came at him" swinging two knives, saying, "Am I going to do it?" The defendant pushed her down onto the couch and was able to grab one of the knives the victim had been using to stab him. He then kept stabbing her until she stopped stabbing him.

The defendant attempted to clean up the blood on the living room carpet, realized it would be futile, wrote the note, and, approximately fifteen minutes after the stabbing, left the apartment and took the victim's SUV. Unsure where to go, he decided to go to New York to see friends. He drove from Brockton to Rhode Island, where he crashed the vehicle.

3. Motion for new trial. The defendant's motion for a new trial raised claims of ineffective assistance of counsel, including a claim that the court room was closed during jury selection and that trial counsel was ineffective for failing to have objected to the closure. In December, 2013, the trial judge conducted an evidentiary hearing on the motion, limited to the claim concerning court room closure. The judge thereafter denied the motion for a new trial in its entirety. The defendant raises the same arguments in his direct appeal as he did in his motion for a new trial.

Discussion. 1. Public trial right. The defendant claims that a new trial is required because his right to a public trial was violated when the court room was closed throughout the process of jury empanelment. See Presley v. Georgia, 558 U.S. 209, 215 (2010); Commonwealth v. Cohen (No. 1), 456 Mass. 94, 106 (2010). A decision whether to allow a new trial "is addressed to the sound discretion of the [motion] judge." Commonwealth v. Perkins, 450 Mass. 834, 845 (2008), quoting Commonwealth v. Moore, 408 Mass. 117, 125 (1990). A reviewing court accepts the motion judge's findings of fact, made after an evidentiary hearing, if they are supported by the record, Commonwealth v. Walker, 443 Mass. 213, 224 (2005), and defers to the judge's assessments of credibility, Commonwealth v. Grace, 397 Mass. 303, 307 (1986), extending "special deference to the action of a motion judge who [as here] was also the trial judge." Commonwealth v. Rosario, 460 Mass. 181, 195 (2011), quoting Commonwealth v. Grace, supra.

In his motion for a new trial, the defendant asserted that although he had requested that members of his family be present during jury selection, they were not permitted to enter the court room because it was closed to the public throughout the process of empanelment; the defendant asserted also that his attorney had indicated he had had no strategic reason not to have objected to

the court room closure.[5] Three witnesses -- the defendant, his brother, and his cousin -- testified at the evidentiary hearing on the motion. The defendant's trial counsel did not testify, and did not file an affidavit as to any strategic reason he might have had for not objecting to the asserted closure.

A defendant asserting a claim of violation of the right to a public trial bears the burden of showing that the court room was closed to the public during the trial. Commonwealth v. Lennon, 463 Mass. 520, 527 (2012), quoting Commonwealth v. Cohen (No. 1), supra at 107-108, and Commonwealth v. Williams, 379 Mass. 874, 875 (1980); Commonwealth v. Buckman, 461 Mass. 24, 28-29 (2011), cert. denied, 132 S. Ct. 2781 (2012). In his written findings, the judge stated that he discredited the testimony of all of the witnesses. He remembered clearly how he had conducted jury selection in this case; he had not ordered the court room to be closed, to his knowledge the court officers had not closed the court room, and no sign had been posted on the door prohibiting

---

[5] The trial transcripts show no objection from trial counsel concerning the exclusion of the defendant's family from the court room at any point during the trial proceedings. Trial counsel did file a motion seeking individual voir dire, based on concerns of racial bias and media attention that focused on the issue of domestic violence; the judge conducted individual voir dire solely on the issue of domestic violence. At the end of the selection process, the judge inquired whether counsel had any objections, and he had none. See Commonwealth v. Lavoie, 464 Mass. 83, 89-90 & n.12 (2013), cert. denied, 133 S.Ct. 2356 (2013), and cases cited.

the public from entering. See Commonwealth v. Garuti, 454 Mass.
48, 56-57 (2009) (judge who was trial judge permissibly may
consider his or her knowledge of conduct of trial in reaching
decision on motion for new trial). Commenting that, at the time
of empanelment in this case, he had been well aware of the
decision of the United States Circuit Court of Appeals for the
First Circuit in Owens v. United States, 483 F.3d 48, 66 (1st
Cir. 2007) (holding that public trial right extends to jury
empanelment),[6] the judge denied the defendant's motion to take
judicial notice of the past practices of other judges in that
particular court house. See Commonwealth v. Morganti, 467 Mass.
96, 97-98, cert. denied, 135 S.Ct. 356 (2014) (discussing "the
legal culture and practice in the Superior Court in
Brockton . . . of acquiescence to the closure of the court room
to facilitate jury empanelment" prior to 2007). The transcript
of the hearing supports the judge's factual findings and provides
ample support for his determination that the witnesses were not
credible.[7]

---

[6] The decision in Owens v. United States, 483 F.3d 48, 66
(1st Cir. 2007), was issued on April 12, 2007; trial in this case
began April 30, 2007, and empanelment commenced on May 1.

[7] The judge commented particularly that the court room door
had not been locked, as one affidavit stated; it was not his
practice to have court officers stand in the doorway, barring
access to the court room, as an affidavit maintained had
occurred; and court officers did not repeatedly leave the court
room and go out into the hallway while court was in session to

Because the defendant has not met his burden of establishing that the court room was closed, there was no abuse of discretion in the motion judge's denial of the motion for a new trial on the ground of a violation of the public trial right. See Commonwealth v. Buckman, 461 Mass. at 29. Nor was the defendant deprived of the effective assistance of counsel. Whatever his reasoning, trial counsel cannot have been ineffective for failing to object to a closure that the motion judge, who had been the trial judge, found after an evidentiary hearing did not take place.

2. Use of word "victim." The defendant objects to the prosecutor's references to the "victim" throughout the trial and in his closing argument.[8] Before jury empanelment, the defendant filed a motion seeking to preclude any references to the term "victim." The judge denied the motion; the defendant did not

---

talk to family members waiting there, as one of the defendants' relatives stated had happened. In addition, because the defendant had exercised his right to be present at sidebar, at least two court officers had been required to be stationed near the bench during questioning of the venire, leaving fewer officers available for other duties.

[8] The defendant also challenges the prosecutor's repeated use of the word "monster" in his closing argument, and counsel's failure to object, as well as the prosecutor's use of other similar language, that the defendant asserts were impermissible attacks on his character. We consider these claims in conjunction with our discussion of other issues in the prosecutor's closing, as part of the defendant's claim of ineffective assistance, infra.

seek a continuing objection, and did not object to the use of the word "victim" during the trial. The defendant maintains on appeal that the use of this term "prejudged" the questions of self-defense and mitigation, which were the heart of the defense, and "injected the prosecutor's personal opinion into the trial," depriving the defendant of the presumption of innocence and violating his right to a fair trial.

In the circumstances of this case, we conclude that the use of the word "victim" did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Rosario, 460 Mass. 181, 190 (2011). Here, there was no dispute that the defendant's girl friend had been killed by being stabbed. We assume "a certain degree of jury sophistication," Commonwealth v. Kozec, 399 Mass. 514, 517 (1987), and do not think it likely that the jury were swayed by the repeated references to the "victim." Nonetheless, we emphasize that the better practice is for the prosecutor, defense counsel, the judge, and all of the witnesses to refrain from describing the person killed as the "victim." See Commonwealth v. Krepon, 32 Mass. App. Ct. 945, 947 (1992) (term "victim" may not be used in sexual assault cases, where complaining witness should be referred to as "alleged victim").

3. Exclusion of "hearsay" testimony by the defendant. The defendant argues that the judge's allowance of the Commonwealth's objection to certain portions of the defendant's testimony

violated his rights to present a defense and to testify on his own behalf, and that trial counsel was ineffective for failing to pursue any objection to the judge's ruling. The defendant contends that he sought to testify concerning statements that he now asserts the victim made to him on the night of her death, immediately before the final confrontation, in which the victim expressed anger at having just learned that the defendant had cheated on her and had also revealed to members of the victim's family statements she had made to the defendant in confidence, including that she had in the past been raped by a cousin.

The defendant argues that his purpose in seeking to testify about the victim's statements was not to have them admitted for their truth, but, rather, to explain the victim's state of mind (her rage). See Commonwealth v. Qualls, 425 Mass. 163, 167 (1997), S.C., 440 Mass. 576 (2003) (although broad rule on hearsay evidence prohibits admission of out-of-court statement offered to prove truth of matter asserted, "the state of mind or intent of a person, whenever material, may be shown by his declarations out of court" [citation omitted]). See also Mass. G. Evid. § 801(c) comment (2015). According to the defendant, this evidence would have provided material support for his contention that the victim had violently attacked him, causing him to stab the victim in self-defense, and without such an

explanation, his description of the victim's sudden rage would have appeared far less comprehensible to the jury.

In evaluating the defendant's claim, we have considered the context in which issues relating to statements of the victim were raised and considered prior to and during the trial. Before trial, the defendant filed a motion in limine to prevent the introduction of evidence concerning the restraining order the victim had obtained against him, including prior alleged conduct by the defendant that defense counsel characterized as prior bad acts, and statements the victim was asserted to have made to two friends and a family member: that the defendant had beaten her and then threatened to kill himself, and that he had said if she tried to leave him he would kill her and then himself. The Commonwealth sought to introduce evidence of the restraining order, the affidavit in support of the order, and statements by the victim's friends, family, and coworkers concerning prior conduct by the defendant.

After a hearing on both motions, the judge ruled that the restraining order itself could be admitted, but the victim's application and affidavit were inadmissible. He also allowed introduction of testimony by percipient witnesses concerning conduct of the defendant toward the victim, to be admitted on the issue of the defendant's and the victim's hostile relationship. Statements of the victim concerning the defendant, including any

fear of him, were not to be admitted.  The defendant did not object to these rulings, before or during trial.[9]

At trial, when the judge sustained the prosecutor's objection to the defendant's incipient testimony about what he said to the victim shortly before the stabbing, or she to him, defense counsel did not challenge the ruling.  Instead, he cautioned the defendant to respond "without getting into any conversation."  Counsel thereafter included this warning in each question, telling the defendant that he was not to describe any statements, and was to answer only in terms of his or the victim's actions.[10]  At no point did counsel make any proffer regarding the introduction of statements by the victim to reflect her angry state of mind; indeed, on two occasions when the defendant said the victim had been "upset" or "mad," counsel interrupted him to explain that he was not to tell the jury what anyone had said.

In his motion for a new trial, appellate counsel argued, as he does on appeal, that the defendant had been seeking to testify

---

[9] The defendant also does not challenge the rulings on appeal, and we discern no abuse of discretion in them.  See, e.g., Commonwealth v. Mendes, 441 Mass. 459, 470-472 (2004); Commonwealth v. Stroyny, 435 Mass. 635, 642-643 (2002).

[10] In response to at least seven of the defendant's answers, counsel interjected some caution such as "don't tell me what she said," "don't tell us what anybody said," or "you're not allowed to say what she said."

about the victim's statements for the purpose of showing her enraged state of mind, and that trial counsel's failure to object deprived him of the ability to present a full defense. Counsel argued that those statements would have included that the victim said she wanted to discuss their relationship, or that she had just learned of the defendant's infidelity and his disclosure to other family members of statements she made to him in confidence. In support of this argument, the defendant attached his own affidavit describing the evidence regarding state of mind he contends he wanted to introduce; he did not submit an affidavit from trial counsel concerning the out-of-court statements, counsel's reasons for not objecting to their exclusion, and whether such a decision had been strategic.

In his ruling on the defendant's motion for a new trial, the judge discredited as self-serving the portion of the defendant's affidavit in which the defendant set forth the evidence he argues he was prevented from introducing. See, e.g., Commonwealth v. Rebello, 450 Mass. 118, 130 (2007) (where motion judge was also trial judge, judge was entitled to discredit defendant's statement in affidavit as self-serving). The defendant has not established that the judge erred in sustaining the Commonwealth's objection, or that defense counsel's decision not to object to the exclusion of whatever hearsay statements the defendant intended to offer was manifestly unreasonable.

4.  Jury instructions.  The defendant argues that errors in the judge's instructions on self-defense and the excessive use of force in self-defense impermissibly shifted the burden of proof from the Commonwealth to the defendant.  The instruction given was based on the language of the model jury instruction on homicide that was in effect at the time of the defendant's trial in 2007.  See Model Jury Instructions on Homicide 30 (1999).  The defendant points to other circumstances in which an instruction has been deemed inadequate to instruct the jury on the Commonwealth's burden of proof where a defendant presents a defense of self-defense or excessive use of force in self-defense.  See, e.g., Commonwealth v. Santos, 454 Mass. 770, 774-775 (2009).  The defendant complains that where the judge inserted an extensive discussion of self-defense between his presentation of reasonable provocation and sudden combat as mitigating factors and his subsequent discussion of excessive use of force in self-defense, which did not explicitly repeat that excessive use of self-defense was a mitigating factor, the jury may have been led to believe that excessive use of force in self-defense was not a mitigating factor.  The defendant also may be suggesting that the judge's instruction on excessive use of force in self-defense improperly placed on the defendant the burden of proving the excessive use of force.

There was no error.  The judge explicitly told the jury that the defendant could be convicted of murder only if the Commonwealth proved beyond a reasonable doubt the absence of three mitigating circumstances, and then listed the three, including the excessive use of force in self-defense.  See Commonwealth v. Bolling, 462 Mass. 440, 448-449 (2012) (discussing essentially identical instruction to that given here, and distinguishing it from improper instruction in Commonwealth v. Santos, supra).  The judge's instruction did group together the mitigating circumstances of heat of passion on reasonable provocation and heat of passion induced by sudden combat, and then separately discussed the excessive use of force in self-defense.  Nonetheless, the judge properly explained that the jury must find the defendant not guilty of any crime if the Commonwealth failed to meet its burden of proving beyond a reasonable doubt the absence of self-defense, and that if the Commonwealth proved the excessive use of force by the defendant in self-defense, the appropriate verdict would be manslaughter.[11]

5.  Ineffective assistance of counsel.  The defendant maintains, as he did in his motion for a new trial, that his

---

[11] The revisions to the Model Jury Instructions on Homicide that this court approved in 2013, and on which the defendant relies, offer a revised explanation of these concepts that may be more clear than the 1999 model instructions in effect at the time of the defendant's trial, but the substance of both versions is the same.

trial counsel's performance denied him constitutionally effective assistance of counsel, and accordingly, that a new trial is required.  He argues that counsel failed to marshal the evidence persuasively to show that he stabbed the victim in self-defense or at least on account of one of the reasons that mitigate murder to voluntary manslaughter; failed to object to certain portions of the medical examiner's testimony; failed to obtain an independent forensic analysis of the crime scene that would have supported the defendant's theory of self-defense or excessive use of force in self-defense; failed to object to leading questions by the prosecutor; and failed to object to a number of improprieties by the prosecutor, particularly with regard to the prosecutor's closing argument.

Our review of the record indicates that, although some of the conduct complained of was not ineffective, in other respects, the performance of the defendant's trial counsel fell below the standard we would expect of an ordinary fallible lawyer.  For instance, counsel's description of the defendant's neck wounds in his opening statement -- that the defendant had been cut "completely across the neck" -- was not supported by the medical evidence.  Rather, the evidence showed that the defendant suffered an internal laceration to his jugular vein, a laceration to his trachea, a stab wound to his stomach, and another to his left palm; the large cut across the defendant's neck shown in

photographs introduced in evidence was the result of surgery conducted to explore and repair the two neck wounds. Counsel's inaccurate characterization of the neck injuries permitted the prosecutor to pursue quite extensively with the medical examiner a discussion of the defendant's actual neck injuries, as well as to argue to the jury the implausibility of the defense counsel's description of the defendant's neck injuries.

Defense counsel's reasons in deciding to pursue this implausible argument are unclear. We note, however, that the defendant himself testified that the victim had "slashed" and "sliced" his throat and that he was bleeding from his throat while still in the victim's apartment and while driving away from the apartment to Rhode Island. Additionally, the defendant's affidavit filed in support of his motion for a new trial mentions his wounds and discusses the importance of presenting the jury with accurate information about the nature of those wounds, which he asserts counsel failed to do by not calling as a witness a physician who had treated him in the hospital in Rhode Island.[12]

It is also the case that, in some respects, the prosecutor's cross-examination of the defendant was improper and the defendant's counsel was deficient in failing to object. The prosecutor took a highly aggressive approach in his cross-

---

[12] The affidavit does not reference the defendant's characterization of his wounds during his trial testimony.

examination of the defendant. He was entitled to do so, but in a number of instances he crossed the line of appropriateness and the questioning bordered on the abusive. The prosecutor, for example, repeatedly asked sarcastic, gender-stereotyped questions of the defendant as to whether he was too "weak" or "frail" to fend off a woman, particularly one who was smaller than he.[13] See Mass. G. Evid. § 1113(b)(3)(c) note (2015) ("Both prosecutors and defense counsel should refrain from what is termed 'broad brushing' or arguments based on racial, ethnic, or gender stereotypes"). The prosecutor also asked several times whether, while the victim was "bleeding to death," the defendant had heard her blood "gurgling" in her throat, although there was no evidence of "gurgling"; and he displayed photographs of the victim's wounds to the defendant, commenting, "go on, you can look at it, you did it," followed by additional similar commentary.[14] These questions and comments were wholly unnecessary and improper.

---

[13] In the same vein, the prosecutor asked, "Well, again, do you have anything wrong with you that makes you less of a man that you don't have that much strength that this woman could overpower you? Anything we should know about?" Defense counsel's objection to that particular question was sustained.

[14] Soon thereafter, the prosecutor displayed another photograph of the victim to the defendant, saying, "Why don't you take a look at your handiwork here . . . . Do you remember making these stab wounds? Look at it." When the defendant did not respond, the prosecutor said, "All right. You want to be a

The defendant challenges a number of asserted improprieties in the prosecutor's closing argument.  Here, as in his cross-examination of the defendant, certain forceful and aggressive statements by the prosecutor permissibly attacked the credibility of the defendant's version of events and offered reasonable explanations of the evidence, such as the inferences that could be drawn from the nature of the victim's wounds.  But the prosecutor also came close to, and at times crossed over, the line of propriety and what is expected from a prosecutor.

In his closing, the prosecutor repeatedly referred to the defendant as a "monster," and a "controlling, jealous, angry, violent man."  The defendant contends that these references were improper in part because they were premised on, and exploited, prior bad act evidence relating to the defendant's conduct toward the victim that the judge had permitted to be introduced solely on the issue of the defendant's relationship with the victim leading up to the stabbing incident.  The Commonwealth maintains that the prosecutor was responding appropriately to the defendant's closing, in which defense counsel had argued that friends and family of the victim who testified at trial had

---

coward, be a coward."  On defense counsel's objection, the judge ordered the jury to disregard the comment.

presented a biased view of the victim, in essence painting her as an "angel" and the defendant as a "monster."[15]

The prosecutor was permitted to respond by urging the jury to pay attention to the testimony of those witnesses who had portrayed the defendant in a light different from that in which he sought to portray himself. The prosecutor fully exploited the defendant's rhetorical use of this angel/monster dichotomy, and his use of defense counsel's term "monster" in this context was not, standing alone, improper. Cf. Commonwealth v. McColl, 375 Mass. 316, 325 (1978) (prosecutor's improper comments were "facetious response" to "similar references . . . made . . . by the defense counsel is his argument").

The prosecutor's closing, however, went beyond the bounds of permissible response to the defendant's argument, and came close to an invitation to the jury that they convict the defendant because of his bad character. At one point, the prosecutor argued:

---

[15] Defense counsel stated:

"We heard from [the victim's] family and friends. We heard about their perceptions of the history of the relationship. . . . These people who described their relationship . . . were all biased. They were all family and friends of her[s]. They all had a view of the relationship where she was . . . the angel. He was the monster, he was the stalker, . . . the abuser. That's how we'd all like our family and friends, I'm sure, and we can see that, they can remember us in a good light."

"[R]emember what [two friends of the victim] said to you, and more importantly remember their body language. These are two women that both saw the defendant a little different than he appeared [when he testified at trial]. I suggest to you that these two women saw what's under the façade. They saw that monster lurking below the surface. Katherine . . . was on the stand trembling, crying, because she'd seen this man so enraged and out of control at a club that she feared for the safety of [the victim]. Elsa . . . was so scared when she stayed at [the victim's apartment] that she slept in the bedroom with the victim with the door locked. They saw the monster below the surface, and the last person to see that monster was [the victim].

". . . .

"And there's nothing [i.e., no sound coming from the victim's apartment] because [the victim] is looking into that monster's eyes as he puts that knife to her throat and she knows if she makes any noise it might be her life."

Defense counsel made no objection to any of the prosecutor's closing remarks, even when the judge at one point sua sponte interrupted the prosecutor. The judge properly instructed the jury that they could consider evidence regarding the relationship between the defendant and the victim only as it bore on the defendant's motive and intent, the limited purpose for which it had been introduced. Considered in the context of the prosecutor's entire closing, we think the jury would have been capable of taking with a "grain of salt" his references to the defendant as a monster. See Commonwealth v. Bradshaw, 385 Mass. 244, 277 (1982).

The prosecutor also came close to, and at times crossed over, the line of propriety with respect to other of his

arguments. In addition to excesses previously noted, the prosecutor described the defendant's account of the stabbing four separate times as "crap, pure and simple," or simply "crap," and another time as "a line of bull." It is permissible for a prosecutor to argue that a defendant's testimony is not credible, see, e.g., Commonwealth v. Espada, 450 Mass. 687, 699 (2008); Commonwealth v. Oliveira, 431 Mass. 609, 613 (2000), but repeated use of crude slang to describe the defendant's version of the critical events, as the prosecutor did here, is offensive and demeaning, and runs the risk of transforming criticism of the defendant's testimony into an attack on the defendant's character. See Commonwealth v. Daley, 439 Mass. 558, 563 (2003) (improper for prosecutor to argue that jury should consider evidence of defendant's bad character as proof that he or she committed crime). Further, the prosecutor's persistent and graphic references to the victim's injuries appeared designed improperly to appeal to the jurors' sympathies and emotions.[16]

---

[16] In a number of recent cases, this court has been confronted with closing arguments by prosecutors who crossed the line between permissible advocacy and improper rhetoric. See, e.g., Commonwealth v. Niemic, 472 Mass. 665, 673-677 (2015); Commonwealth v. Scesny, 472 Mass. 185, 200-206 (2015). See also Commonwealth v. Lewis, 465 Mass. 119, 128-133 (2013). We again refer counsel to the Massachusetts Guide to Evidence, § 1113 (2015). See Commonwealth v. Scesny, supra at 203 n.29. In addition, we commend to trial judges the suggestion that, immediately before counsel make their closing arguments, jurors be provided with a brief instruction about the purposes and limitations of closing arguments. See Commonwealth v. Olmande,

See Mass. G. Evid. § 1113(b)(3)(C) (impermissible to appeal to jurors' emotions, passions, prejudices, or sympathies).

Notwithstanding these improper aspects of the prosecutor's cross-examination and closing, and the failures of defense counsel in not objecting to them, we conclude that the errors did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

During the prosecutor's cross-examination of the defendant, defense counsel objected repeatedly to the prosecutor's overreaching questions and comments, and the judge sustained a number of them. With respect to the closing, the judge told the jury -- albeit only in general terms -- immediately before closing arguments and again in his charge, that such arguments are not evidence. Most importantly, the evidence against the defendant was overwhelming, and we cannot conclude that the prosecutorial excesses were likely to have influenced the verdict. See Commonwealth v. Scesny, 472 Mass. 185, 203-206 (2015); Commonwealth v. Wright, supra. See also Commonwealth v. Dagley, 442 Mass. 713, 725-726 (2004), cert. denied, 544 U.S. 930 (2005). The number, nature, and severity of the victim's stab wounds; the relative sizes of the victim and the defendant; the

---

84 Mass. App. Ct. 231, 241-243 (2013) (Agnes, J., concurring in result).

blood evidence relating to the location, amount, and identity of blood within the victim's apartment and in the SUV the defendant drove after the stabbing; the defendant's own testimony describing what happened; and the defendant's note, found on a table in the living room, together made the defendant's theory of self-defense or even excessive use of force in self-defense implausible, particularly in light of the evidence concerning the nature of the relationship between the victim and the defendant from January, 2004, until her death in September, 2004.

We conclude that there is no reason to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.

Judgment affirmed.

Order denying motion for a new trial affirmed.